# United States Court of Appeals
## For the First Circuit

No. 11-1260

UNITED STATES OF AMERICA,

Appellee,

v.

CARLENS RIGAUD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Lipez, and Howard,
Circuit Judges.

Valerie S. Carter, with whom Carter & Doyle LLP was on brief,
for appellant.
Kelly Begg Lawrence, Assistant U.S. Attorney, with whom Carmen
M. Ortiz, U.S. Attorney, was on brief, for appellee.

June 29, 2012

LIPEZ, Circuit Judge. After the government disclosed new information regarding its confidential informant ("CI") in 2010, appellant Carlens Rigaud moved to suppress evidence recovered in 2006 during the execution of a search warrant in Malden, Massachusetts. In so doing, Rigaud sought an evidentiary hearing to establish that there were material omissions from an affidavit submitted in support of the request for a search warrant that undermined the probable cause finding on which the warrant was issued. The district court denied Rigaud's motion. Rigaud then pleaded guilty to federal drug trafficking charges pursuant to an agreement that expressly reserved his right to appeal the denial of his motion to suppress. He now pursues that appeal. After careful review of the record, we affirm the district court's judgment.

## I.

### A. Factual Background

In June 2006, Sergeant Kevin Molis of the Malden Police Department applied for a no-knock warrant to search 95 Medford Street, relying in his affidavit on information that he received from CI Betty Trainor (a/k/a Patriot), Trainor's five controlled buys at 95 Medford Street in May and June 2006, his surveillance of 95 Medford Street, and other information. On June 9, 2006, a state court judge approved Molis's application and issued a no-knock search warrant for 95 Medford Street. Molis, other state and local authorities, and federal agents of the Bureau of Alcohol, Tobacco,

-2-

Firearms and Explosives ("ATF") executed the search warrant that day and seized, among other things, two handguns and 76 bags of crack cocaine weighing a total of 40.35 grams. Rigaud, his brother Carlin Rigaud, Kettia Saint Louis, and others were present during the search and were arrested and charged with state drug and firearm violations. Rigaud was subsequently released on bail.

While Rigaud was out on bail, Trainor introduced him to ATF Special Agent Karen Carney-Hatch, who was acting in an undercover capacity. On August 24, 2006, Carney-Hatch met Rigaud in a parking lot in Malden, Massachusetts, and purchased from him approximately three grams of crack cocaine for four hundred dollars. During the transaction, Carney-Hatch was equipped with a body wire and recorder.

On October 26, 2006, ATF Special Agent John Mercer, Jr., submitted an affidavit in support of an application for arrest and search warrants and criminal complaints pertaining to a number of individuals, including Carlens and Carlin Rigaud, described as members of a gang known as the "Haitian Mob." Mercer's affidavit did not request permission to search 95 Medford Street, but instead sought permission to search two other residences of individuals allegedly involved with the Haitian Mob's drug trade. Based on Mercer's affidavit, a federal magistrate judge issued arrest warrants for Rigaud and others and search warrants for the two residences described in the affidavit. Rigaud was arrested on

October 26, 2006, and indicted on November 29, 2006, on multiple federal drug trafficking and weapons charges.

At Rigaud's impending trial on the federal charges, prosecutors planned to introduce evidence recovered during the June 2006 search of 95 Medford Street that led to Rigaud's state arrest and charges. On February 4, 2010, during preparation for the federal trial, Trainor admitted to prosecutors that prior to each of the five controlled buys that she made in May and June 2006, she hid forty dollars of her own money in her underwear. She then used that money to buy for her personal use an additional bag of crack cocaine, which she kept concealed from detectives by hiding it in her vagina. The government disclosed this information to Rigaud the day Trainor provided it. On February 19, 2010, the government also disclosed to Rigaud that Trainor had admitted that "she continued to regularly buy and use crack cocaine" between the spring of 2006 and the spring of 2007, a period that included the five controlled buys.

## B. Procedural Background

On March 26, 2010, in response to the government's disclosures, Rigaud filed a motion to suppress all of the evidence seized as a result of the search warrant that was executed on June 9, 2006. Rigaud also sought to suppress the "fruits" of the August 24, 2006, transaction during which he sold crack cocaine to Carney-

-4-

Hatch.[1]  The district court held a suppression hearing on July 1, 2010, and denied the motion on July 7, 2010.  After the motion was denied, Rigaud entered a plea agreement with the government on December 6, 2010.  Under the terms of the agreement, Rigaud pleaded guilty to three drug trafficking charges.[2]  In return, the government dismissed two gun-related charges[3] and withdrew the information it had filed to establish two felony drug convictions justifying a sentence enhancement.  Rigaud was sentenced to 188 months' imprisonment followed by four years of supervised release.  As noted, pursuant to the plea agreement, Rigaud retained the right to appeal the district court's denial of his motion to suppress.

## II.

Rigaud focuses on the alleged inadequacy of the Molis affidavit that led to the June 9, 2006 search of 95 Medford Street. The Molis affidavit stated that before each of Trainor's controlled

---

[1] Although Rigaud never specifies what these fruits are, we assume that he refers to the three grams of crack cocaine sold to Carney-Hatch for four hundred dollars and the audio recording of that transaction captured by Carney-Hatch's body wire.

[2] Rigaud pleaded guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute Cocaine Base in violation of 21 U.S.C. § 846, one count of Possession with Intent to Distribute Cocaine Base in violation of 21 U.S.C. § 841(a)(1), and one count of Possession with Intent to Distribute and Distribution of Cocaine Base in violation of 21 U.S.C. § 841(a)(1).

[3] The government dismissed one count of Felon-in-Possession of Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1) and one count of Possession of Firearm in Furtherance of Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A).

buys, "[i]t was determined that [Trainor] was not in possession of cocaine."  However, the affidavit provided no details about how detectives made that determination.  In light of Trainor's admission that she carried her own money into, and drugs out of, 95 Medford Street during the controlled buys, Rigaud alleges that Trainor could not have been searched before or after the buys. Moreover, he asserts that Trainor's dishonesty and concurrent drug use rendered her information fatally untrustworthy.  Thus, Rigaud claims that he was entitled to an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  He argues that he could have shown that (1) Molis recklessly omitted critical information regarding his search of Trainor, including the failure to search her at all; and (2) if the affidavit had disclosed the failure to search Trainor, there would not have been sufficient probable cause and the warrant would not have been issued.[4]  Rigaud further argues that there was insufficient support in the Molis affidavit to justify issuing a no-knock warrant.

Rigaud also challenges the Mercer affidavit that led to his October 26, 2006 arrest, alleging that it omitted the same critical information as the Molis affidavit.  Finally, Rigaud

---

[4] Rigaud's argument that he was entitled to an evidentiary Franks hearing is his fallback position.  He first argues that he was entitled to suppression.  We focus our analysis on the Franks issue.  If Rigaud was not able to make the showing required for a Franks hearing, it follows that he also was not entitled to have his motion to suppress granted.

argues that the good faith exception articulated in <u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984), does not overcome the defects in the affidavits or the lack of probable cause.

## A.  The Molis Affidavit

### 1.  Entitlement to a <u>Franks</u> Hearing

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and generally requires law enforcement officers to secure a warrant supported by probable cause prior to effecting a search or seizure, <u>see</u> <u>United States</u> v. <u>Paneto</u>, 661 F.3d 709, 713 (1st Cir. 2011). Probable cause exists when the totality of the circumstances suggest that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States</u> v. <u>Hicks</u>, 575 F.3d 130, 136 (1st Cir. 2009) (internal quotation marks omitted).

As in this case, information supporting probable cause may be set out in an affidavit submitted with the application for a search warrant. Although "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant," that presumption may be refuted during a so-called <u>Franks</u> hearing. <u>Franks</u>, 438 U.S. at 171. However, to get a <u>Franks</u> hearing, a party must first make two "substantial preliminary showings": (1) that a false statement or omission in the affidavit

-7-

was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause.[5]  See id. at 155-56; Hicks, 575 F.3d at 138; United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002). Failure to make a showing on either element dooms a party's hearing request.  In the event that a hearing is granted and "at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side [or the omitted material included], the affidavit's . . . content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Franks, 438 U.S. at 156.  In this case, we need not address the first Franks requirement, because Rigaud has plainly failed to meet the second (establishing the effect of the omission on the probable cause showing).

The district court noted that the "proper inquiry is not whether probable cause would have existed if the affidavit had

_____

[5] There is "an important difference between the 'necessary' inquiries when the challenge is to the omission of an allegedly material fact rather than to the inclusion of an allegedly false material statement.  With an omission, the inquiry is whether its inclusion in an affidavit would have led to a negative finding by the magistrate on probable cause.  If a false statement is in the affidavit, the inquiry is whether its inclusion was necessary for a positive finding by the magistrate on probable cause."  United States v. Castillo, 287 F.3d 21, 25 n.4 (1st Cir. 2002).

-8-

revealed what Trainor hid going into and returning from the controlled buys but rather whether probable cause could be found if the affidavit stated that Molis did not search Trainor's underwear and body cavities and was generally more explicit about the searches actually performed." The court found that because underwear and body cavity searches are not required in controlled buys, a magistrate would not find an "affidavit fatally defective for explicitly acknowledging a failure to do what the law does not require." Moreover, despite Trainor's later admissions, the district court found that the controlled buys apparently went "exactly as planned and, on five occasions, resulted in the purchase of drugs at the premises under investigation."

Regarding Trainor's general trustworthiness, the district court found that "Trainor's lack of candor was, ultimately, unnecessary to the finding of probable cause. The affidavit provided ample grounds to credit her preliminary statements and to corroborate what she said and did notwithstanding subsequent disclosures of her drug use or undisclosed purchases." Based on these findings, the district court concluded that "the totality of the circumstances sufficiently demonstrated that Trainor was substantially reliable and that, even had the alleged omissions been included in Molis's affidavit, there was probable cause to issue the search warrant."

The district court's finding that the requisite showing for a <u>Franks</u> hearing was not made will be disturbed only if it is clearly erroneous.  <u>United States</u> v. <u>Cartagena</u>, 593 F.3d 104, 112 (1st Cir. 2010).  Clear error "exists only when we are left with the definite and firm conviction that a mistake has been committed."  <u>United States</u> v. <u>D'Andrea</u>, 648 F.3d 1, 14 (1st Cir. 2011) (internal quotation mark omitted).

We agree with the district court that the disclosure that Trainor was not searched or was searched inadequately would not have resulted in a negative finding on probable cause.  We note, as the district court did, that the controlled buys went essentially as planned - Trainor entered 95 Medford Street with marked government money and exited the apartment with crack cocaine.  The fact that Trainor took her own money into 95 Medford Street and purchased drugs for personal use would hardly undermine the assertion that drugs were being sold in the apartment.  If anything, Trainor's side purchases would support probable cause to believe that drugs were, in fact, being sold there.

Moreover, the Molis affidavit states that a number of sources independent of Trainor suggested that drugs were being sold from 95 Medford Street.  For example, anonymous calls were received by the Malden Police Drug Hotline, the Malden Police dispatcher, and the Malden Drug Unit, each reporting ongoing drug activity at 95 Medford Street.  The caller to the Drug Unit said that a dozen

people per day visited the apartment for brief periods, which led him to believe that drugs were being sold there. Molis also received information from Malden Police Chief Kenneth Coye, who told Molis that an elected official had contacted him and conveyed constituent complaints about drug activity at 95 Medford Street.

Additionally, during the two weeks preceding the warrant application, the Malden Police Drug Unit conducted surveillance of 95 Medford Street and observed various cars making brief visits to the apartment. Officers ran the license plates of some of these visitors and discovered that the registered owners of some of the vehicles had previous drug-related convictions, and one owner had a number of open drug-related cases.

Molis and other detectives also observed individuals associated with 95 Medford Street engage in activity that the detectives believed was consistent with counter surveillance activity, including "scrutinizing activities in the area . . . [and] monitoring any vehicles that were parked in the area that contained occupants." Molis and the other detectives saw individuals remain outside near the rear door of 95 Medford Street while drug activities were occurring. On one occasion, Molis and Sergeant Michael Goodwin attempted to follow a car that had just dropped someone off at 95 Medford Street. Molis said that the driver engaged in what the detectives believed to be "obvious counter surveillance driving by traveling in a manner that appeared

deliberately inexpedient and designed to put them behind our unmarked vehicle in order to monitor our activities." Another detective observed that "some males upon returning to their vehicles after exiting . . . 95 Medford [Street] would then circle the block before leaving the area." Molis believed this to be "a counter surveillance maneuver designed to detect if the subject [was] being followed."

We also agree with the district court that ample corroboration of the information that Trainor provided neutralizes any apparent untrustworthiness brought to light by her late disclosures. Trainor told Molis that she had purchased crack cocaine from seven or eight different people in an apartment at 95 Medford Street. She said that all of the people from whom she had purchased drugs were black, and two were female. Trainor stated that she would sometimes see as many as six men in possession of handguns inside 95 Medford Street. She said that she had seen a man who went by "C" with a handgun in his waistband and had also seen handguns on a table in the apartment. Trainor also described the door through which she had entered 95 Medford Street as being brown and tan with a doorbell, a peephole, and the number "95" affixed to it. Although some of the information that Trainor provided, particularly information about the activity inside the apartment, did not lend itself to corroboration prior to the preparation of his affidavit, Molis was able to confirm key pieces

-12-

of the information that Trainor provided.  For example, after speaking with Trainor, Molis visited 95 Medford Street "during the early morning hours" and corroborated the information that Trainor gave about the outside and entrance to the apartment.  He confirmed that the back door of 95 Medford Street had a peephole and a piece of white tape with "95 Medford" written on it affixed to the upper part of the door.  Molis photographed the door and showed the photograph to Trainor.  Trainor confirmed that it was the door through which she had entered 95 Medford Street to buy crack cocaine.

Similarly, Trainor provided Molis with the telephone number that she called to arrange purchases of crack cocaine at 95 Medford Street.  She did not provide any of the sellers' actual names but did say that she had purchased crack cocaine from two males who went by "C" and "Little C."  Trainor said that she thought C and Little C were brothers.  Detective Richard Connor of the Everett Police Drug Unit indicated to Molis that based on information he received from Sergeant George Keralis of the Southern Middlesex Drug Task Force, he believed that a black man named Little C sold crack cocaine.  Connor was also in possession of a telephone number belonging to Little C.  The number Connor showed Molis matched the number that Trainor gave Molis and was the same number that Trainor used to set up the controlled buys.  When Molis followed up with Keralis directly, Keralis told him that his

information about Little C came from a reliable confidential source.

In addition, Molis discovered through the Motor Vehicles Database that a woman named Kettia Saint Louis was registered as residing at 95 Medford Street and confirmed with the Postal Service that a person with the last name Saint Louis received regular mail at that address. Molis showed Trainor a picture of Saint Louis. Trainor identified her as one of the females that she had seen at 95 Medford Street from whom she had purchased crack cocaine.

Based on the information from Trainor and other sources set forth in Molis's affidavit, we conclude that the district court did not err by finding that any omission about the lack of an underwear or body cavity search of Trainor was not critical to the probable cause finding. Because Rigaud was unable to satisfy the second Franks requirement, the district court did not err by declining to hold a Franks hearing.[6]

### 2. The No-Knock Warrant

As he did before the district court, Rigaud alleges that the contents of the Molis affidavit "failed to establish probable

---

[6] Because we conclude that the district court did not err in its evaluation of the affidavit, we do not reach Rigaud's argument regarding the Leon good faith exception. See United States v. Leon, 468 U.S. 897 (1984) (holding that evidence obtained in good faith by law enforcement officers relying upon a search warrant may be used in a criminal trial even if the warrant is subsequently deemed invalid).

cause justifying the issuance of a no-knock warrant."[7]  He argues that the only justification provided for the no-knock warrant was Trainor's statement that she had seen guns inside 95 Medford Street on previous occasions.  Rigaud alleges that Trainor's statement alone was insufficient to justify the no-knock warrant and further argues that, because Trainor was untruthful about the side buys, her word does not suffice.  Thus, Rigaud argues, evidence recovered during the search of 95 Medford Street pursuant to the no-knock warrant should have been suppressed.

The government argues that under Hudson v. Michigan, 547 U.S. 586 (2006), the exclusionary rule does not apply to violations of the knock-and-announce rule.  Thus, Rigaud was not entitled to suppression on that basis.  The government is right.  See Hudson, 547 U.S. at 599; United States v. Garcia-Hernandez, 659 F.3d 108, 112 (1st Cir. 2011).  Rigaud's argument for suppression fails on that basis alone.[8]

---

[7] The district court did not make a determination about the no-knock element of the search warrant.

[8] To the extent Rigaud argues that permission to forego knocking and announcing requires its own probable cause determination, he misstates the law.  Reasonable suspicion is the proper standard.  See Richards v. Wisconsin, 520 U.S. 385, 394 (1997).  That standard is easily met here in light of Trainor's observations inside 95 Medford Street, where she had seen as many as six men in possession of handguns as well as handguns resting on a table inside the apartment.  As discussed, despite Trainor's failure to disclose that she carried her own money into and drugs out of the apartment, her information was otherwise trustworthy.

-15-

## B.  The Mercer Affidavit

Rigaud's suppression arguments based on the Mercer affidavit are difficult to understand.  First, he argues that the fruits of Carney-Hatch's August 24, 2006, undercover buy should have been suppressed because Trainor, who introduced Carney-Hatch and Rigaud, "had been using crack without the government's permission and her observations were undoubtedly affected by her addiction."  He also argues that the Mercer affidavit was "as materially disingenuous as Molis'[s] . . . because he adopts the legitimacy of the five controlled buys [and] . . . vouches for [Trainor,] boasting that she has provided accurate, truthful, and reliable information in the past and continues to do so in the present" (internal quotation marks omitted).  Rigaud alleges that if Mercer's affidavit had stated that Molis had not searched Trainor or had searched her inadequately, there would have been insufficient probable cause to issue warrants and, thus, "any fruits from the search and arrest should have been suppressed."

Regarding the fruits of the ATF undercover buy, the government argues that because Rigaud did not identify a constitutional violation related to that buy, suppression is inappropriate.  The government also argues that even if information about Trainor's side buys and her drug use were included in the Mercer affidavit, there was sufficient probable cause to issue the search and arrest warrants.

-16-

The government is correct that the buy was not a search or seizure and hence it did not implicate Rigaud's Fourth Amendment rights. Thus, the exclusionary rule is simply inapplicable. <u>See Garcia-Hernandez</u>, 659 F.3d at 112. To the extent that Rigaud seeks to challenge the Mercer affidavit as the basis for subsequent search and arrest warrants, he states only that "the warrants should not have issued and any of the fruits from the search and arrest should have been suppressed." This undeveloped argument fails for the same reason that the challenge to the Molis affidavit fails.

<u>Affirmed</u>.