# United States Court of Appeals
## For the First Circuit

No. 14-1561

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID MCLELLAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Selya, and Lynch,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, Federal Public Defender Office, for appellant.
Crystal S. Yang, Special Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

July 6, 2015

**TORRUELLA, Circuit Judge**.  On February 19, 2010, law enforcement officers executed a federal search warrant at 180 High Street in Taunton, Massachusetts as part of an investigation into an individual using the online usernames "babylick" and "a35scott" to trade child pornography.  After speaking with one of the co-owners (who was also an occupant), the officers searched the entire single-family residence, including the bedroom of Appellant David McLellan, who was renting a bedroom in the residence.  In McLellan's bedroom, officers seized numerous electronics containing more than 6.3 million images and videos of child pornography and files depicting McLellan sexually abusing an infant.  McLellan was subsequently indicted on one count of sexual exploitation of children under 18 U.S.C. § 2251(a) and one count of transporting child pornography under 18 U.S.C. § 2252(a)(1).  Following the denial of his request for a Franks hearing and for suppression of the evidence seized during the search, McLellan pleaded guilty, specifically reserving his right to appeal the district court's rulings.  Finding no error with these rulings, we affirm.

## I.  Background

This investigation began in February 2008, when Canadian authorities alerted the Federal Bureau of Investigation ("FBI") that an individual in or near Boston, Massachusetts was using the username babylick to post images of child pornography to an online bulletin board system.  A few months later, in June 2008, the FBI

obtained from Yahoo! the user information for the username a35scott. They learned that a35scott self-identified as Adam Scott from Medford, Massachusetts and that he had logged into Yahoo! from seven different IP addresses between January and May of 2008.[1] Three of the IP addresses were linked to Verizon accounts assigned to Dennis Truso in Boston, Massachusetts, one was linked to a Comcast account assigned to Greg Little in East Boston, Massachusetts, and the other two were linked to accounts in Boston, Massachusetts, and Cambridge, Massachusetts. Notably, one of the IP addresses linked to Dennis Truso matched the IP address provided by the Canadian authorities in relation to babylick, thus suggesting that the two usernames belonged to the same individual.

The FBI continued investigating a35scott, and by March 2009, it had issued a report identifying him as an active member in the Multiply.com e-group[2] "YOUCANTSEEMETOO," where he was observed posting and trading child pornography. Though the zipcode

_____

[1] An IP address, or Internet Protocol address, "is the unique address assigned to every machine on the internet." United States v. Cameron, 699 F.3d 621, 627 n.1 (1st Cir. 2012) (quoting United States v. Kearney, 672 F.3d 81, 84 n.1 (1st Cir. 2012)). It "consists of four numbers separated by dots, e.g., 166.132.78.215." Id. (quoting Kearney, 672 F.3d at 84 n.1).

[2] Multiply.com was a social networking website from March 2004 through May 2013 which provided users with a medium to share photos, videos, and other information with their network of contacts. In addition to providing a means to connect with contacts, the service also allowed registered users to create "e-groups" in order to meet and socialize with other members who may have similar interests.

associated with a35scott's Multiply.com account was in California, the IP addresses were once again traced to the internet accounts of Dennis Truso and Greg Little. The report noted, however, that a35scott was not necessarily Dennis Truso or Greg Little, but might be another member of the Truso or Little household, or another person entirely.

For reasons unclear from the record, the investigation into a35scott appears to have gone quiet from March 2009 through December 2009. The investigation resumed on December 1, 2009, however, when FBI Special Agent Raj Patel, acting in an undercover capacity, logged on to Gigatribe.com, a peer-to-peer ("P2P") file-sharing network. Like other P2P networks such as Napster, Kazaa, and Limewire, Gigatribe allows a user who has downloaded the service's software to directly connect to other users' computers in order to search and download files that other users have designated for sharing. Unlike the traditional P2P network, however, the Gigatribe system requires a user to already know another user's username and to be accepted by that other user before contact and file-sharing can occur. The Gigatribe files are also encrypted when they are exchanged. Because of these added layers of security, Gigatribe has become a preferred P2P system for trafficking child pornography.

When Agent Patel logged in to Gigatribe on December 1, he observed a35scott logged in as well. Agent Patel proceeded to

browse a35scott's shared directory and discovered numerous files with names indicative of child pornography, such as "!-baby unsorted" and "7yo private, cbaby and dea (5yo)." He selected three files to download, but, midway through the downloads, a35scott blocked Agent Patel's access. As a result, two of the three files were only partially downloaded and could not be opened. The third file, however, titled "Boner0170 (Thai boys).jpg," was fully downloaded (the "December 1 Download"). This file contained a collage of twenty-five images of child pornography, mostly consisting of two prepubescent boys either partially clothed or naked with a focus on their genitals.

The FBI was able to trace the file's origin to a single IP address -- 173.76.210.90. This IP address was registered to Verizon and, according to Verizon's records, was assigned to the residential high speed internet service account of Darryl J. St. Yves, located at 180 High Street in Taunton, Massachusetts. The FBI confirmed St. Yves's residential address with both the Massachusetts Registry of Motor Vehicles ("RMV") and the United States Postal Service ("USPS"), and agents visibly observed that a single mailbox at 180 High Street listed St. Yves and two other occupants -- Keller and Theobold.

Armed with this information, FBI Special Agent John Locke applied for a search warrant for 180 High Street on February 11, 2010. In his affidavit in support of the warrant, Special Agent

Locke recounted the investigation by Special Agent Patel linking the Gigatribe download to an IP address belonging to the account of St. Yves, as well as the FBI's subsequent confirmation that St. Yves lived at 180 High Street both at the time of the download and at the time of the affidavit. The affidavit also described how individuals involved in the transportation and possession of child pornography often keep their pornography close by in secure locations and how complicated forensic examinations of electronics are often necessary to discover the hidden files containing child pornography. Accordingly, the affidavit concluded that there was "probable cause to believe that there exists evidence, fruits and instrumentalities" of the crimes of the transportation and possession of child pornography at 180 High Street and that "Darryl J. St. Yves and/or other residents, as yet unknown," committed those crimes. The magistrate judge agreed and issued the search warrant.

Notably, the affidavit omitted certain information presumably known to Agent Locke. For example, it did not reference either the February 2008 Canadian tip regarding "babylick" or the March 2009 report detailing the FBI's investigation into a35scott's involvement in the YOUCANTSEEMETOO e-group on Multiply.com. It also failed to mention that this activity had been linked to IP addresses traced to Dennis Truso, Greg Little, and two others, and not to Darryl J. St. Yves. The affidavit did, however, state that

it did "not contain every fact known to [Special Agent Locke] with respect to this investigation" but rather "it contain[ed] those facts that [he] believe[d] to be necessary to establish probable cause for issuance of a search warrant" for 180 High Street.

The FBI agents executed the warrant on February 19, 2010. When they arrived, both St. Yves and McLellan were present. St. Yves explained to the agents that he and Keller owned -- and occupied -- the residence and that they had rented a third room -- the room formerly occupied by Theobold -- to McLellan "approximately" two months prior, on or about December 1, 2009. He added that all three occupants used his Verizon internet service via a router which created a wireless network, but each resident had his own computers and did not share files. The agents then informed St. Yves that they were looking for child pornography and would be examining all the computers to determine who was most likely responsible. St. Yves admitted that he possessed some child pornography but had not actively searched for it; rather, it was downloaded along with adult pornography videos St. Yves had collected. Upon further inquiry, the FBI agents learned that St. Yves claimed to be unfamiliar with the username a35scott, to not use Yahoo!, and to have never used Gigatribe. St. Yves also told the agents that McLellan was "the most knowledgeable about computers" among the three residents.

Following this conversation, the FBI proceeded to search 180 High Street. They seized several computers, 497 CDs and DVDs, five hard drives, one four-gigabyte thumb drive, and three cell phones from McLellan's bedroom. A subsequent forensic examination of these items revealed images and videos of child pornography, including ones of McLellan sexually abusing an infant.[3] Accordingly, on August 2, 2012, McLellan was indicted on one count of sexual exploitation of children under 18 U.S.C. § 2251(a) and one count of transporting child pornography under 18 U.S.C. § 2252(a)(1).

On April 23, 2013, McLellan filed a motion attacking the search from two angles. First, he argued that the search was unconstitutional -- and thus the seized electronics should be suppressed -- because the warrant was insufficiently particular. To support this claim, McLellan alleged that 180 High Street was a "multi-unit dwelling" and the affidavit failed to provide probable cause to search his specific room because there was no evidence to link anyone other than St. Yves to the December 1, 2009, download. Second, McLellan requested a hearing under Franks v. Delaware, 438 U.S. 154 (1978), because, he contended, the affidavit in support of the search warrant omitted material information that would have negated probable cause. Specifically, McLellan argued that had the

---

[3] When McLellan was sentenced in May 2014, the forensic examination was still ongoing, yet over 6.3 million files had already been uncovered.

magistrate judge been informed that a35scott had been linked to IP addresses connected to Dennis Truso, Greg Little, and others -- but not to St. Yves -- in 2008 and early 2009, the magistrate judge would have found the December 1, 2009, download to be stale by February 2010 because there would have been evidence suggesting that a35scott frequently moved around and "piggyback[ed]" on the internet service of others.

The district court heard arguments on McLellan's motion on October 16, 2013, and orally denied the motion at the conclusion of the hearing. Regarding the particularity argument, the district court found that

> in light of the undisputed facts that this appears to be a single family dwelling in which there were a number of individuals, three specific, there was, that the warrant was sufficiently particular. There was here no separate entrance to the street. The room in question was not equipped for independent living. It appeared that the occupants had joint access to the common areas. And there's no sufficient evidence that the police understood that the house, a single family house, was subdivided. The search warrant I rule was sufficiently particular.

As to McLellan's Franks argument, the district court agreed that "certain data was omitted" but emphasized that "[t]here can be no Franks hearing unless the omitted information was critical to the probable cause determination." The district court went on to hold that

> the omitted information was not recklessly omitted and the information was not essential

-9-

or critical to the probable cause determination. The warrant does state that the affidavit does not contain every fact known to me with respect to this investigation. The magistrate was put on notice of that. It's also unclear to the Court at this stage that the affiant here or indeed the investigative team ever had a full picture of [a]35scott's movements at the time the warrant was issued.

Now, since I decline to find that the omission was intentional or reckless that's sufficient standing by itself to deny a <u>Franks</u> hearing.

Also, the second prong, if I address that, in this case, I find that had this information been known and all disclosed in the [affidavit], the well-known proclivity of those who possess this child obscenity hang onto it does not cut against probable cause here and the two month gap here is not, does not make this information stale and indeed supports the issuance of the warrant in this case.[4]

With both his request for a <u>Franks</u> hearing and motion to suppress denied, McLellan opted to plead guilty to the two-count indictment while reserving his right to appeal the district court's rulings. On May 15, 2014, the district court sentenced McLellan to 204 months of imprisonment followed by fifteen years of supervised release. This timely appeal followed.

---

[4] The district court also held that even if the search did exceed the warrant, or if the affidavit contained intentionally or recklessly omitted material information, the FBI acted in good faith, and thus denial was still appropriate pursuant to <u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984). Because we agree with the district court on the merits, we do not review this alternate holding.

-10-

## II.  Discussion

### A.  The Franks Hearing

McLellan first argues that the district court erred in denying his request for a Franks hearing.  We disagree.

#### 1.  Standard of Review

We review the denial of a Franks hearing for clear error. United States v. Grant, 218 F.3d 72, 76 (1st Cir. 2000).  Clear error exists "only when we are left with the definite and firm conviction that a mistake has been committed."  United States v. Hicks, 575 F.3d 130, 138 (1st Cir. 2009) (internal quotation marks omitted).  We review probable cause determinations, meanwhile, de novo.  United States v. Brunette, 256 F.3d 14, 16 (1st Cir. 2001). In conducting this latter review, "[o]ur task, like that of the magistrate judge and district court, 'is simply to make a practical, common-sense decision whether, given all the circumstances[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

#### 2.  The Requirements for a Franks Hearing

The Fourth Amendment protects individuals against unreasonable intrusion by the government.  This protection stems from the Amendment's instruction that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

-11-

particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

As we have repeatedly emphasized, "[a]n affidavit supporting a search warrant is presumptively valid."  United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013).  Still, a defendant may attempt to rebut this presumption and challenge the veracity of the affidavit.  Id.; see also Franks, 438 U.S. at 171.  To do so, he or she must make "two substantial preliminary showings."  United States v. Rigaud, 684 F.3d 169, 173 (1st Cir. 2012) (internal quotation marks omitted).  First, the defendant must show "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth."  Id.; see also Franks, 438 U.S. at 155-56; Grant, 218 F.3d at 77.  Second, this "falsehood or omission [must have been] necessary to the finding of probable cause."  Rigaud, 684 F.3d at 173.  In the case of an omission, this means establishing that the inclusion of the omitted information "would have led to a negative finding by the magistrate on probable cause."  Id. at 173 n.5.  A failure to make a showing on either of these two elements dooms the defendant's challenge.  Id. at 173.

If, however, this preliminary showing is made, the defendant is entitled to a hearing -- known as a Franks hearing -- where he or she can try to establish by a preponderance of the evidence that the affiant did in fact make a false statement or

-12-

omission "knowingly and intentionally, or with reckless disregard for the truth" and that "with the recklessly omitted information added to the affidavit, the reformed affidavit fails to establish probable cause." Gifford, 727 F.3d at 98 (internal quotation marks omitted); see also Franks, 438 U.S. at 156; Rigaud, 684 F.3d at 173. Should the defendant establish by proof that these standards have been met, the warrant is voided and the fruits of the search are excluded. Gifford, 727 F.3d at 98; see also Franks, 438 U.S. at 156; Rigaud, 684 F.3d at 173.

As to the second prong, a warrant is based on probable cause when "'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.'" United States v. Chiaradio, 684 F.3d 265, 279 (1st Cir. 2012) (quoting United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988)). It is not necessary, however, for that "'belief [to] be correct or more likely true than false.'" United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)); see also United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) ("[P]robable cause need not be tantamount to proof beyond a reasonable doubt. . . . Probability is the touchstone." (alteration in original) (internal quotation marks omitted)). Instead, we "examine [an] affidavit in

a practical, commonsense fashion."  United States v. Woodbury, 511 F.3d 93, 98 (1st Cir. 2007) (alteration in original) (quoting Feliz, 182 F.3d at 86).

### 3. **The Omitted Information Was Immaterial**

McLellan argues that Agent Locke intentionally and recklessly omitted material information regarding the FBI's investigation into a35scott prior to the December 1 Download from his affidavit, and had this information been included in the affidavit, probable cause would have been lacking.  Specifically, McLellan points to: (1) the February 2008 Canadian tip into babylick; (2) the March 2009 report detailing a35scott's involvement in the YOUCANTSEEMETOO e-group on Multiply.com, which was registered with a California zip code; and (3) the links between these child pornographic activities and IP addresses traced to Dennis Truso, Greg Little, and others, but not to Darryl J. St. Yves (collectively, the "Omitted Information").  This information, according to McLellan, revealed that whoever a35scott was, he or she was nomadic and never remained at the same place for very long, and thus when the FBI applied for the warrant two months after Agent Patel's single December 1 Download, there was no longer probable cause to believe that a35scott would still be at 180 High

-14-

Street.  In other words, the information contained in the affidavit was stale.[5]

The parties do not dispute that this information was omitted from the affidavit,[6] though they do disagree over whether

[5]  It is important to take a moment to emphasize what McLellan is not arguing.  He is not suggesting that the affidavit in support of the warrant was stale because it was unlikely he would have kept his illicit child pornography for more than two months.  This argument would readily fail, as courts have held time and time again that child pornography traders and collectors maintain their collections for long periods of time, and often store it in safe, close, and easily accessible locations.  See United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008) (holding that a warrant application was not stale where more than three years had passed since law enforcement acquired the information contained in the affidavit because "customers of child pornography sites do not quickly dispose of their cache"); United States v. Ricciardelli, 998 F.2d 8, 12 n.4 (1st Cir. 1993) ("[H]istory teaches that collectors [of child pornography] prefer not to dispose of their dross, typically retaining obscene materials for years."); see also United States v. Vosburgh, 602 F.3d 512, 528 (3d Cir. 2010) (finding that a four-month gap between warrant application and attempt to access child pornography did not render information stale because it was not unreasonable "for officers to infer that the person responsible for those attempts already possessed some quantity of child pornography"); United States v. Gourde, 440 F.3d 1065, 1071 (9th Cir. 2006) (en banc) (finding that a four-month delay did not render information stale because "[t]hanks to the long memory of computers, any evidence of a crime was almost certainly still on his computer, even if he had tried to delete the images").  Rather, McLellan is arguing that by February 2010, a35scott would have already relocated from 180 High Street, and brought his or her child pornography along.

[6]  Indeed, the affidavit itself states that it "does not contain every fact known to [Agent Locke] with respect to this investigation" but rather "contains those facts that [he] believe[d] to be necessary to establish probable cause."  Though we have upheld warrants based on affidavits with similar language in the past -- and do so again today -- we once again caution law enforcement officers about this practice.  "[T]he best way to ensure that the Fourth Amendment's probable cause requirement is complied with is to meticulously comply with it."  Khounsavanh, 113

-15-

or not the omission was intentional and/or reckless.  We need not decide this, however, because the inclusion of the Omitted Information would have been immaterial to the probable cause determination.  See Rigaud, 684 F.3d at 173 ("In this case, we need not address the first Franks requirement, because [the defendant] has plainly failed to meet the second (establishing the effect of the omission on the probable cause showing).").

Information contained in an affidavit is stale if it established probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance.  Sgro v. United States, 287 U.S. 206, 210 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.").  "When evaluating a claim of staleness, we do not measure the timeliness of information simply by counting the number

---

F.3d at 289 (internal quotation marks omitted).  And

> [m]eticulous compliance involves more than an agent's own judgment as to the ultimate importance of a piece of information to a judgment of probable cause.  The agent also should, in the interest of both judicial economy and fairness, ask the further question, "Is this information so trivial, remote or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant?"  Unless an affirmative answer can be given, the information should be included -- even if, in context, its weight seems too slight to tip the balance away from a finding of probable cause.

United States v. Stewart, 337 F.3d 103, 107 (1st Cir.), as amended (Oct. 14, 2003) (footnote omitted).

-16-

of days that have elapsed.  Instead, we must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." Morales-Aldahondo, 524 F.3d at 119.

Here, the Omitted Information would not have led the magistrate to conclude that the connection between a35scott and 180 High Street was stale.  The Omitted Information shows that from February 2008 until March 2009, a35scott was using IP addresses assigned to Dennis Truso in Boston, Greg Little in East Boston, and two other accounts in Boston and Cambridge -- with the majority of those uses occurring between January and May 2008.  This information can be taken in multiple ways.  It could mean, as McLellan argues, that a35scott was nomadic and moving around, using whatever internet he or she could find.[7]  However, it could also indicate locations where a35scott lived, worked, and/or spent his or her free time during that time span.[8]

_____

[7] McLellan also implies that the Omitted Information could suggest that a35scott was merely using whatever nearby internet he or she could connect to.  Putting aside the fact that McLellan provides absolutely no evidence to support this allegation, we have previously rejected the argument that the possibility of a third party stealing a subscriber's internet access defeats probable cause to search the subscriber's residence.  See Grant, 218 F.3d at 75 ("[E]ven discounting for the possibility that an individual other than [defendant] may have been using his account, there was a fair probability that [defendant] was the user and that evidence of the user's illegal activities would be found in [his] home."); see also United States v. Pérez, 484 F.3d 735, 740 (5th Cir. 2007).

[8]  In fact, given that there were multiple links to Dennis Truso and Greg Little over a multi-month span, this latter scenario is

-17-

Either way, this ambiguous information as to a35scott's travels between January 2008 and March 2009 has very little relevance to a35scott's location in February 2010. To the contrary, even taking into account this Omitted Information, the best information the FBI had in February 2010 as to a35scott's current location was still the trace of the December 1 Download to St. Yves's account at 180 High Street. Nothing in the Omitted Information suggests, for example, that a35scott had used an IP address linked to a different location between December 1, 2009, and the filing of the affidavit on February 11, 2010; nor does it suggest that a35scott had used IP addresses linked to multiple or different locations around the time of the December 1 Download. And without any evidence that a35scott had relocated, we do not believe this two-plus-month delay in applying for the warrant rendered the information in the affidavit stale. This is especially true considering those two months were used by the FBI to corroborate (through checks with the RMV and USPS and with a drive-by site visit to 180 High Street) that St. Yves -- the account holder for the targeted IP address -- had not moved. Cf. United States v. Tiem Trinh, 665 F.3d 1, 13-14 (1st Cir. 2011) (holding that information contained in an affidavit was not stale where one month had elapsed between the warrant's issuance and the last observed narcotics-related activity); United States v.

_____

actually more likely.

Bucuvalas, 970 F.2d 937, 940-41 (1st Cir. 1992) (finding information in an affidavit not to be stale where events related to the conspiracy charge took place four years prior to the search warrant application because a co-conspirator was seen bribing a police officer one month before the warrant and the affiant had verified that a person related to the conspiracy was still designated as a record owner for the premises), abrogated on other grounds by Cleveland v. United States, 531 U.S. 12 (2000). But cf. United States v. Charest, 602 F.2d 1015, 1018 (1st Cir. 1979) (finding sixteen days between date of murder and date of affidavit rendered information stale because it was "contrary to common sense and logic to expect a murderer to keep the murder weapon in his own premises for almost three weeks").

The Omitted Information, therefore, does not render a35scott's link to 180 High Street in February 2010 stale, and as such does not negate the probable cause finding.[9] See Rigaud, 684

---

[9]  With good reason, McLellan does not challenge that without the Omitted Information, probable cause to search 180 High Street for a35scott and child pornography existed following the December 1 Download. See, e.g., Chiaradio, 684 F.3d at 279 (finding probable cause where affidavit "spelled out how [the investigation] led to the defendant's IP address and, in turn, his abode"); United States v. Gillman, 432 F. App'x 513, 515 (6th Cir. 2011) (finding sufficient nexus between illegality and defendant's residence where "(1) child pornography was transferred to police from a specific IP address; (2) that IP address was registered to the defendant's residential address; and (3) the defendant actually lived at that address"); United States v. Reniqar, 613 F.3d 990, 991 (10th Cir. 2010) (same); Vosburgh, 602 F.3d at 526-27 (same); Pérez, 484 F.3d at 740 (same); United States v. Hay, 231 F.3d 630, 635-36 (9th Cir. 2000) (same).

-19-

F.3d at 173 n.5 ("With an omission, the inquiry is whether its inclusion in an affidavit would have led to a negative finding by the magistrate on probable cause."); Woodbury, 511 F.3d at 98 (explaining that a reviewing court examines an affidavit in "a practical, commonsense fashion" to determine whether it "would warrant a man of reasonable caution to believe that evidence of a crime will be found" (citations and internal quotation marks omitted)). Because McLellan failed to make this preliminary showing, he cannot satisfy the prerequisites for a Franks hearing. Accordingly, there was no error -- let alone a clear error -- in the district court's decision to deny McLellan's request.

## B. The Motion to Suppress

McLellan also argues that even taking the warrant as is -- i.e., without considering the Omitted Information -- his motion to suppress should have been granted because the "multi-unit" character of 180 High Street made the warrant insufficiently particular. As such, the search of his room exceeded the warrant's permissible scope. Once again, we disagree.

### 1. Standard of Review

Our review of the district court's denial of McLellan's motion to suppress is bifurcated: "we review its findings of fact for clear error and apply de novo review 'to the application of law to those facts and to conclusions of law.'" United States v. Werra, 638 F.3d 326, 330 (1st Cir. 2011) (quoting United States v.

-20-

Rheault, 561 F.3d 55, 58 (1st Cir. 2009)).  As discussed above, a finding of fact is clearly erroneous "only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made."  United States v. Mousli, 511 F.3d 7, 11 (1st Cir. 2007) (quoting United States v. Ferreras, 192 F.3d 5, 9-10 (1st Cir. 1999)) (internal quotation marks omitted).  So long as any reasonable view of the evidence supports the decision, the district court's ruling will be upheld.  Id. at 11-12.

### 2. The Fourth Amendment's Particularity Requirement

The Fourth Amendment requires that a search "be justified by probable cause and . . . satisfy the particularity requirement, which limits the scope and intensity of the search."  Mousli, 511 F.3d at 12 (quoting United States v. Bonner, 808 F.2d 864, 867 (1st Cir. 1986)) (internal quotation marks omitted); see also U.S. Const. amend. IV.  A warrant satisfies the particularity requirement if "the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort" such that no other premise might be mistakenly searched.  Mousli, 511 F.3d at 12 (quoting United States v. Vega-Figueroa, 234 F.3d 744, 756 (1st Cir. 2000)) (internal quotation marks omitted).  To that end, "the general rule is that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid."  Id. (quoting Pérez, 484 F.3d at 741) (internal quotation marks omitted).  By contrast, a warrant for a single-unit residence

authorizes the search of that entire dwelling regardless of who the area being searched belongs to, so long as the items delineated in the warrant could reasonably be found in the searched area. See United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991) ("A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence."); United States v. Canestri, 518 F.2d 269, 273-74 (2d Cir. 1975) (holding that a warrant directing the entire house be searched included a locked storeroom allegedly not belonging to the target of the search because "a locked storeroom is a natural and logical place to hide stolen guns" and "there was no evidence presented at the suppression hearing which showed that [the target of the search] did not have access to the storeroom"). Whether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into.

### 3. The Warrant for 180 High Street Was Sufficiently Particular

Here, McLellan argues that 180 High Street was a multi-unit dwelling, and thus the search of his room violated the Fourth Amendment's particularity requirement. This argument is in deep trouble before it even begins, however, because the district court made a factual determination that 180 High Street was a single-

-22-

family residence. Specifically, the district court found that McLellan's room "was not equipped for independent living" because there was no separate entrance to the street and the occupants had joint access to the common areas such as the kitchen and living rooms. Though McLellan disagrees with the court's ultimate conclusion as to a single- versus multi-family residence, he does not dispute this underlying description of his room and the premises.[10] Accordingly, we are hard-pressed to disagree with the district court's factual finding that 180 High Street is a single-family residence; and at the very least, the finding is in no way clearly erroneous. See Ferreras, 192 F.3d at 11 (holding that an attic was included in a search warrant for the building's second floor because it was connected to the second floor apartment, lacked an exit to the street, and was "not equipped for independent living"); United States v. Hinds, 856 F.2d 438, 441-42 (1st Cir. 1998) (finding a single-family building where there "were no indications, such as separate doorbells or mailboxes, that more than one family lived" in the building and "the top floor . . . was not separated from the floors below by a door"). McLellan's reliance on cases such as Maryland v. Garrison, 480 U.S. 79 (1987),

_____

[10] Indeed, McLellan's only rebuttal is that the house was connected to a shared driveway which could accommodate eight to ten cars. This fact, which was included in the affidavit, does not change our conclusion about the residence in this case.

-23-

and <u>United States</u> v. <u>Vaughan</u>, 875 F. Supp. 36 (D. Mass. 1995) --
all involving multi-unit residences -- are therefore misplaced.

Perhaps recognizing that this argument is a lost cause,
McLellan also contends that even if the warrant was particular on
its face, information learned during the execution of the warrant
revealed a "factual mistake" regarding the premises which required
the FBI to exclude McLellan's bedroom from its search.    <u>See</u>
<u>Garrison</u>, 480 U.S. at 87 ("[The officers] were required to
discontinue the search of respondent's apartment as soon as they
. . . were put on notice of the risk that they might be in a unit
erroneously included within the terms of the warrant.");
<u>Ricciardelli</u>, 998 F.2d at 17 n.10 (noting that when police
executing a warrant discover a factual mistake, they "'must
reasonably limit their search accordingly'" (quoting <u>Garrison</u>, 480
U.S. at 89 n.14)).    We reject McLellan's contention that any
"mistake" was made.

Contrary to McLellan's contention, the additional
information gathered by the FBI actually <u>increased</u> the likelihood
that McLellan -- and not one of the other occupants -- was
a35scott.[11]  First, by talking to St. Yves, the FBI learned that all

---

[11]   Remember, the warrant authorized a search of 180 High Street
because there was probable cause to believe that "Darryl J. St.
Yves <u>and/or other residents, as yet unknown</u>, of 180 High Street"
had possessed and transmitted child pornography from an internet
account assigned to that address under the username a35scott.
Thus, it was not only St. Yves the FBI was interested in, but
rather all internet users at that address.

three occupants shared St. Yves's internet account via a wireless router, and thus every internet connection established from any of the occupants' computers would trace back to the same IP address. See In re BitTorrent Adult Film Copyright Infringement Cases, 296 F.R.D. 80, 84 (E.D.N.Y. 2012) (explaining that "[i]f you use a router to share an Internet connection, the router gets the IP address issued directly from the ISP" and thus "[a]n IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones" (internal quotation marks omitted)); Patrick Collins, Inc. v. Doe 1, 288 F.R.D. 233, 235 (E.D.N.Y. 2012) ("[A] single IP address may host one or more devices operated or owned by multiple users (for example, a computer or handheld tablet), each communicating on the same network, such as with a wireless router or a business intranet." (internal quotation mark omitted)). Second, St. Yves denied using Gigatribe or Yahoo!, and given his admission that he did (albeit accidentally) have child pornography on his computer, the FBI had reason to believe St. Yves's denial. Third, St. Yves described McLellan as the most computer savvy of the three occupants. And finally, perhaps most telling, St. Yves informed the FBI that McLellan moved into 180 High Street around December 1, 2009 -- the same day that Agent Patel downloaded the file containing child pornography from a35scott from an IP address originating at 180 High Street. We

fail to see how this new information should have led the FBI to conclude that McLellan could not be a35scott.

The motion to suppress, therefore, was properly denied.

### III. Conclusion

For the reasons explained above, McLellan fails to make a preliminary showing that the Omitted Information from Agent Locke's affidavit would have negated the magistrate judge's probable cause finding, and thus the district court did not err in denying his request for a <u>Franks</u> hearing. Moreover, because we agree with the district court's conclusion that the warrant was sufficiently particular, McLellan's motion to suppress was properly denied.

**<u>AFFIRMED</u>**.