# United States Court of Appeals
## For the First Circuit

No. 18-2147

UNITED STATES OF AMERICA,

Appellee,

v.

JAMIE L. MELO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Gary G. Pelletier, with whom Pelletier Clark & Caley, LLC was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

March 27, 2020

**BARRON**, **Circuit Judge**.  Jamie Melo challenges his 2017 convictions, which arise from the investigation into a criminal scheme involving Carlos Rafael.  Colloquially known as the "Codfather," Rafael owned numerous commercial fishing businesses in the New Bedford, Massachusetts, area and was the leader of a conspiracy that smuggled unreported cash-income from his businesses to his personal bank accounts in the Azores, which are Portuguese islands in the Atlantic Ocean.  Melo's convictions stemmed from his role in assisting Rafael in smuggling cash through Logan International Airport in Boston and onto a plane headed to the Azores in the fall of 2015.  The convictions were for one count of conspiracy, in violation of 18 U.S.C. § 371, and one count of structuring the export of monetary transactions, in violation of 31 U.S.C. § 5324(c)(3).  Finding no merit to Melo's challenges to these convictions, we **affirm.**

**I.**

In early 2015, the United States Internal Revenue Service ("IRS") began investigating Rafael after learning that he had not reported some of his taxable income.  Undercover IRS agents, feigning interest in buying one of Rafael's businesses, soon learned that he was taking unreported cash with him on flights to the Azores and depositing the cash in a bank account that he maintained there.

Rafael explained to the undercover agents that he was able to smuggle cash through the airport because he had a connection in the Bristol County Sheriff's Office in Massachusetts, Antonio Freitas, who could help him get past airport security. Rafael also told them that Jamie Melo was a friend of his in the Bristol County Sheriff's Office.

Rafael later told the undercover agents that he was planning a trip to the Azores on November 10, 2015. He repeatedly declined the undercover agents' requests, however, to carry money for them on that flight.

When these agents first asked Rafael to do so, he refused to carry their money and suggested that they "would never meet" Freitas. In rejecting a second request from the undercover agents to carry their money with him, one of the undercover agents testified that Rafael refused to do so because there would "be law enforcement officers with him from the Sheriff's Office and he did not feel comfortable with those individuals with him to be smuggling the cash."

On the day of the planned trip, federal law enforcement agents set up surveillance to track the movements of Rafael and his travel companions at the airport. Melo, who was also traveling to the Azores that day to manage the "Thanksgiving in the Azores" program that he ran through the Bristol County Sheriff's Office,

arranged for a Sheriff's Office van to pick up other passengers, including Rafael, who were taking the same flight to the Azores.

Before going through security at the airport, Melo met with three of the other Azores-bound travelers in a public restroom. He asked them if they could carry envelopes for Rafael onto the plane.

When Rafael went through the security checkpoint, agents for the United States Transportation Security Administration ("TSA") discovered that he was carrying $27,000 in cash on his person. In response, the TSA agents directed Rafael to a United States Customs and Border Patrol window, where he could declare the currency.

Rafael then joined Melo on the plane. The two sat together in first class. When the plane landed, the envelopes found their way back to Rafael. Soon thereafter, he deposited $76,000 in cash in his personal bank account in the Azores.

Law enforcement continued investigating the cash-smuggling scheme after the November 10, 2015, trip. Sometime thereafter, in consequence of that investigation, Rafael pleaded guilty to charges of conspiracy, bulk cash smuggling, and tax evasion. Freitas, for his part, was convicted of related crimes after a jury trial.

On August 30, 2017, Special Agent Alison Pauley ("SA Pauley") of the Federal Bureau of Investigation and Special Agent

Michael Ryan ("SA Ryan") of the United States Department of Homeland Security traveled to Melo's home to request an interview with him regarding the November 2015 trip to the Azores. Melo consented to an interview and invited the agents into his residence.

During the course of the interview, which Melo's attorney John Zajac participated in by phone, Melo admitted, among other things, to having passed out envelopes on Rafael's behalf to other passengers on the trip and to having carried an envelope for Rafael on the November 10, 2015, flight. Melo also stated that he only began to suspect that the envelopes contained cash after the TSA agents had stopped Rafael and forced him to report his currency.

On October 25, 2017, a grand jury in the District of Massachusetts handed down a three-count indictment against Melo. The indictment charged him with having engaged in conspiracy, in violation of 18 U.S.C. § 371 (count one), bulk cash smuggling and aiding and abetting, in violation of 31 U.S.C. § 5332(a) and 18 U.S.C. § 2 (count two), and structuring the export of monetary transactions, in violation of 31 U.S.C. § 5324(c)(3) (count three). A jury found him guilty on counts one and three. The District Court subsequently sentenced Melo to one year of probation. Melo timely filed his notice of appeal ten days later.

We start with Melo's challenge, based on Miranda v. Arizona, 384 U.S. 436 (1966), to the District Court's denial of his motion to suppress statements that he made to SAs Pauley and Ryan during the August 30, 2017, interview.  The District Court rejected the motion on the ground that, although it was not "an easy [case]," Melo did not need to be given the Miranda warnings -- which were given only after he had been arrested following the conclusion of that interview -- before or during the interview because Melo was not then in custody.

When reviewing a district court's decision on a motion to suppress, we consider its "conclusions of law de novo and its factual findings, including its credibility determinations, for clear error."  United States v. De La Cruz, 835 F.3d 1, 5 (1st Cir. 2016).  In the Miranda context especially, we are reluctant to disturb the district court's suppression decision, such that "[i]f any reasonable view of the evidence supports the denial of a motion to suppress, we will affirm the denial."  United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008).

Because there is no dispute that the agents subjected Melo to an interrogation through the questions that they asked during the interview, see United States v. Sanchez, 817 F.3d 38, 44 (1st Cir. 2016) ("Interrogation for Miranda purposes includes 'any words or actions on the part of the police . . . that the

police should know are reasonably likely to elicit an incriminating response from the suspect.'" (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980))), "the need for a Miranda warning" in this case "turns on whether a suspect is in custody," United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (quoting United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). We employ a two-step process for making that determination.

"[T]he initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" Howes v. Fields, 565 U.S. 499, 509 (2012) (second alteration in original) (first quoting Stansbury v. California, 511 U.S. 318, 322-23 (1994) (per curiam) and then quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). We have previously identified a nonexhaustive number of circumstances that are relevant to this aspect of our custody analysis, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Swan, 842 F.3d at 31 (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). In conducting this analysis, we must keep in mind that a finding of custody "depends on the objective circumstances of the interrogation, not on the subjective views

harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323.

This inquiry into "whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last." Howes, 565 U.S. at 509. Once we complete the freedom-of-movement step, we must still ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id.

In considering the circumstances in which the questioning took place here, we note at the outset that the interview was conducted in Melo's home. That is of some significance because, although "a suspect's dwelling may at times comprise a custodial interrogation, such a location generally presents a less intimidating atmosphere than, say, a police station." Hughes, 640 F.3d at 435-36 (internal citation omitted) ("[I]t is important to note that the interview occurred in surroundings familiar to the defendant: his own home.").

In addition, we note, only two armed officers were present for the questioning, see id. at 436 (finding that having only two officers involved in the interview, even if two more were present nearby, was not enough to make the interrogation custodial), and neither one brandished his or her weapon in Melo's presence during the questioning. The only other law enforcement

personnel present, moreover, were two plainclothes computer technicians who entered Melo's home to search his phone and computers but had no direct contact with Melo.

Finally, we note two other features of the setting in which the interview occurred that support the District Court's custody ruling.  The first is that, although the agents were in Melo's home for more than three hours, they repeatedly interrupted their questioning, at Melo's request, to ensure that his attorney, Zajac, could participate by phone.  The second is that the District Court determined that the agents' tone during their questioning of Melo was cordial and professional throughout the questioning.

Nevertheless, Melo contends that the District Court erred in finding that the setting for the interview was not custodial, in part because he contends that the record clearly shows that the agents "communicate[d] . . . to Melo and his attorney" their intention to arrest Melo if he "was not truthful and cooperative."  Melo asserts that this point is critical, because even though "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda," Stansbury, 511 U.S. at 324, when agents do convey an intent to arrest the defendant, as he alleges clearly occurred here, that fact should figure into the custody analysis.

Yet, Melo contends, the District Court failed to factor the statements that he alleges that the agents made into its analysis.

Even if we assume that Melo's legal contention about the significance of the officers' alleged statements has force, cf. id. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."), he still needs to show that the District Court clearly erred in declining to find that those officers in fact made those statements. To make that case, Melo points to testimony that both he and his attorney Zajac gave at the suppression hearing. Zajac testified, for example, that he asked the agents "if their intention was to arrest [Melo]," to which they responded that "they were unsure if they were going to arrest [Melo] or not, it depended upon his cooperation." And Melo testified to the same effect.

Moreover, Melo notes, neither of the agents denied in their own testimony at that hearing that Zajac asked them whether they intended to arrest Melo. Rather, they merely stated that they could not remember Zajac asking that question. For example, when asked if "Attorney Zajac asked you whether you were definitely going to arrest [Melo]," SA Ryan responded that he did not "recall that question being asked."

But, a review of the record shows that, although the agents said they did not recall if Zajac specifically asked them

- 10 -

whether they intended to arrest his client Melo, both agents were unequivocal in stating that they did not convey an intention to arrest Melo if he failed to cooperate. For example, when asked whether it "[w]as . . . ever communicated to [Melo] that he was going to be arrested if he didn't cooperate," SA Pauley responded, "[n]o." In addition, SA Ryan affirmed that they never disclosed their intention to arrest Melo that day.

Thus, nothing Melo points us to in the record indicates that the District Court clearly erred in declining to find that the agents expressed an intention to arrest Melo if he failed to cooperate with their questioning, as Melo contends that they did. See United States v. Martin, 749 F.3d 87, 97 (1st Cir. 2014) ("A district court's plausible interpretation of the facts cannot be rejected on clear error review just because the record might sustain a conflicting interpretation.").

In addition, the record shows that Melo did not include his assertion about the agents expressing an intent to arrest him in his initial affidavit giving an account of the interview; instead, he made this assertion for the first time at the hearing on the motion to suppress. As a result, the District Court supportably could have found that the account that Melo gave at the hearing of what had transpired was less than convincing. Considering the record as a whole, therefore, Melo's challenge to the District Court's custody analysis fails insofar as it depends

- 11 -

on the record requiring us to conclude that the agents told Melo that he would be arrested if he did not cooperate with them during the interview.

Melo nonetheless notes that, even if the District Court did not err in declining to find that the agents expressed an intention to arrest Melo if he failed to cooperate, the District Court did find that the agents told Melo that he was a "target" of their investigation. And, Melo asserts, "[t]hat disclosure, alone, even without the statement about cooperation, is more than sufficient to create a custodial situation."

To support that proposition, Melo cites to United States v. Chan Hok Shek, No. CRIM.A. 08-10317-DPW, 2010 WL 4694448, at *7 (D. Mass. Nov. 10, 2010). But, Chan Hok Shek itself states -- rightly -- that "even if" agents inform a defendant "that he was a suspect, . . . that would not necessarily mean he was in custody for purposes of Miranda." Id.; see also Stansbury, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). Thus, the mere fact that the agents told Melo that he was a target of their investigation does not, on its own, convince us that Melo held an objectively reasonable belief that he could not terminate

the interaction with the agents, such that the setting was custodial.

To be sure, Melo contends that there is more in the record to support a finding that he was in custody than that he was told by the agents that he was a "target" of their investigation. Melo argues, in particular, that if the District Court had taken full account of the restraints on his movement that he contends were placed on him while he was questioned by the agents, then the agents' statement about him being a target of their investigation, when combined with their having imposed those restraints, compelled a finding that he was in custody during their questioning of him.

To support that contention, Melo points to various instances in which he argues the District Court either made an erroneous factual finding, such as by concluding "that, during the interview, Melo got up from his table and got water," even though one of the agents testified to contrary, or failed to analyze certain facts evidencing Melo's restricted movement, including an unresolved dispute about whether Melo was free to get his own diabetes medication. Melo further contends that the District Court improperly considered the subjective beliefs of the agents in dismissing the relevance of key facts concerning his freedom of movement during the interview, such as when the District Court concluded that SA Ryan watching Melo walk down the hallway to the

- 13 -

bathroom had "more to do with the firearms that the agents knew remained in the bedroom and [was] not indicative of restraints on Melo akin to custody."

But, we are not persuaded. Melo's contention that the District Court clearly erred in finding that he was free to get himself water during the interview fails because there was ample testimony at the suppression hearing to the effect that Melo was free to get up and grab himself water. That the record also shows that one of the agents once got water on Melo's behalf does not persuade us that the District Court clearly erred in finding as it did on that score, especially when the agents testified that they never told Melo that he could not leave the kitchen table or otherwise move about his home.

Melo is correct that the District Court failed to resolve the factual dispute about whether Melo or one of the agents retrieved Melo's diabetes medication during the interview. But, given the other testimony that was provided at the hearing regarding Melo's freedom of movement, which included undisputed testimony that Melo did move around his home at various points during the interview, we find the resolution of this one factual dispute immaterial to the determination of whether the District Court's overall custody analysis is supported by the record. See Swan, 842 F.3d at 31; Boskic, 545 F.3d at 77 (noting that "we will affirm the denial" of a suppression motion if there is "any

reasonable view of the evidence [that] supports the" district court's decision).

That leaves us with Melo's contention that the District Court improperly analyzed the significance of SA Ryan monitoring Melo as Melo proceeded to use the bathroom. But, even if we set aside any consideration of the subjective motivation of the agents and focus solely on the intrusiveness of the agents' monitoring, see Hughes, 640 F.3d at 436 ("While escorting a suspect throughout his home may have some bearing on the custody inquiry, there is no evidence that the troopers followed the defendant so closely as to intrude upon any intimate moment or private activity." (internal citation omitted)), the District Court here found that SA Ryan "observed [Melo] closely when he had to go to use the bathroom . . . , but did not go into the bathroom with him." As Melo does not argue that any aspect of the District Court's factual finding on this point was erroneous, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), we do not see how this finding suffices to compel a conclusion that his movements were so restricted as to warrant a finding that he had been placed in custody.

Finally, we reject Melo's contention that his case is no different than United States v. Bullins, a district court case from within this Circuit that found that a defendant who was interrogated in his own home was in custody for Miranda purposes. 880 F. Supp. 76, 78-80 (D.N.H. 1995). In Bullins, police detained

and separated the defendant and his wife, before executing a search warrant on the defendant's home. See id. at 77. After the search commenced, the defendant entered the home with the police and agreed to speak with an officer for questioning. See id. But, because the "defendant was directed to remain seated at his kitchen table," the district court found that "[a]lthough he was neither handcuffed nor formally placed under arrest at any time, defendant was not free as a practical matter to either leave or move about his home while the search was under way." Id. at 77-78. Meanwhile, "[f]our or five agents, who were armed and dressed in raid jackets, carried out the search." Id. at 78. These circumstances, the district court concluded, placed the case "somewhere in the gray area between a plainly custodial and plainly non-custodial interrogation," but the district court ultimately found that the setting was custodial. Id.

Melo posits that "most, if not all, of the Bullins factors are present" in his case. Melo, however, was never told that he could not leave the kitchen, his home was not full of armed agents during the questioning, and there was no indication that law enforcement purposely separated Melo from his wife at the beginning of the interview. Rather, Melo's wife arrived at the home after Melo was placed under arrest. Thus, even if we assume that Bullins was rightly decided, it addresses a significantly different setting from the one in which Melo was questioned.

- 16 -

Accordingly, it supplies no basis for overturning the District Court's denial of Melo's suppression motion.

## III.

Melo next challenges the District Court's decisions to admit into evidence certain statements that Rafael made to undercover agents before the November 10, 2015, trip to the Azores and to admit records of Melo's phone contacts with Rafael and Freitas from late March to December of 2015. Melo presses the first part of his challenge under Federal Rule of Evidence 801(d)(2)(E),[1] which provides that a statement is not hearsay when it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Melo brings the second part of his challenge under Federal Rules of Evidence 403 and 404(b).

We start by considering his challenge to the admission of Rafael's statements. We then turn to his challenge to the admission of the phone records.

---

[1] In its motion in limine, the government sought to admit Rafael's statements that he: (1) "[h]ad off-the-book cash transactions that were not reported to the IRS"; (2) relied on Freitas to help him smuggle cash through the airport and that he was friendly with Melo; and (3) "[o]n November 10, 2015, was caught with cash he had to declare, but fortunately 'passed it to a lot of people that were there with' him."

Before the start of Melo's trial, the government filed a motion in limine to admit certain statements that Rafael made to federal agents both before and after the November 10, 2015, trip to the Azores, pursuant to Rule 801(d)(2)(E).  For a statement to come into evidence under that rule, "[t]he proponent . . . must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy."  United States v. Ford, 839 F.3d 94, 105 (1st Cir. 2016) (quoting United States v. Ciresi, 697 F.3d 19, 25 (1st Cir. 2012)).  "A district court's determination 'as to whether this burden has been met is known in this circuit as a Petrozziello ruling,' after our holding in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977)."  Id. at 105-06 (quoting Ciresi, 697 F.3d at 25).  However, "[a] court may provisionally admit a statement under Rule 801(d)(2)(E) and defer its final Petrozziello ruling until the close of evidence."  Id. at 106 (quoting United States v. Paz-Alvarez, 799 F.3d 12, 29 (1st Cir. 2015)).

Though Melo opposed the motion, the District Court conditionally admitted Rafael's pre-trip statements, assuming the government could make a satisfactory showing that Rafael and Melo were members of the conspiracy at the time of Rafael's statements and that the statements were made in furtherance of the conspiracy.

The District Court, however, excluded Rafael's post-trip statements from evidence.

At trial, Melo's counsel did not object to the conditional introduction of Rafael's pre-trip statements. And, at the end of the government's case-in-chief, the District Court found that the government had made the necessary showings under Rule 801(d)(2)(E) for the pre-trip statements to be admitted into evidence. But, rather than object at that point, Melo chose to renew his objection to the admission of Rafael's pre-trip statements at the end of the trial, which the District Court once again denied.

To preserve a challenge to a district court's Petrozziello ruling, such that we review its findings for clear error rather than plain error, see id., the defendant must "object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence," Ciresi, 697 F.3d at 26. But here, Melo opposed the government's motion in limine before trial and objected to the statements' admission only at the close of evidence. Moreover, Melo stated that he had "no objection" when the District Court conditionally admitted the statements during the actual trial. By failing to object to the conditional admission of Rafael's pre-trip statements at that time, Melo failed to preserve his challenge. We thus review his challenge to the District Court's Petrozziello

ruling only for plain error.  See United States v. Laureano-Perez, 797 F.3d 45, 65 (1st Cir. 2015).

Melo argues that the District Court erred in admitting Rafael's pre-trip statements because they were made "prior to Melo's alleged involvement in the conspiracy."  In fact, Melo contends, Rafael told the undercover investigators before the November trip that Melo did not carry cash for him on flights.

But, "whether [the defendant] was a coconspirator at the time the statements were made is irrelevant -- we have held that an individual who joins a conspiracy 'at a later date, . . . effectively adopt[s] coconspirator declarations previously made.'" United States v. Flemmi, 402 F.3d 79, 94 (1st Cir. 2005) (second alteration in original) (quoting United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 1995)).  Melo concedes as much, but responds that his case is distinguishable because "the coconspirator has disavowed [the] defendant's participation in the conspiracy at the time the coconspirator uttered the statements."

Melo fails, however, to show how it is clear or obvious -- or even right -- that this distinction has force and thus that he can satisfy the plain error standard.  See United States v. Marcano, 525 F.3d 72, 74 (1st Cir. 2008) (describing United States v. Caraballo-Rodriguez, 480 F.3d 62, 70 (1st Cir. 2007), as "holding that plain error cannot be found in case law absent clear and binding precedent.").  That being so, we reject

Melo's challenge to the introduction of Rafael's pre-trip statements.

**B.**

That brings us to the District Court's decision to admit certain of Melo's phone records, which the District Court admitted into evidence on the first day of trial. Those records spanned a period that ran from late March of 2015 to December of that same year and demonstrated contacts between Melo's phone and phones associated with, respectively, Rafael and Freitas.

Melo objected to the admission of the records under Federal Rule of Evidence 403 on the ground that many of the contacts between himself and Rafael or Freitas reflected in those records predated the existence of the alleged conspiracy, which the indictment alleged began in October of 2015. Melo emphasizes in pressing this argument on appeal that there is nothing inherently criminal about the placement of phone calls between acquaintances. In consequence, he contends, the probative value of the records of such contacts is slight at best.

The District Court overruled Melo's objection and noted that any concerns about the records' weight or credibility could be handled through cross-examination. The parties agree that Melo's challenge to the admission of his phone records is preserved and that we review the District Court's decision to admit the

records for abuse of discretion. See United States v. Bradshaw, 281 F.3d 278, 284 (1st Cir. 2002).

We see none here, as we agree with the District Court that Melo's phone records for the period from March to December of 2015 were relevant and not so prejudicial as to substantially outweigh their probative value. After all, the fact that there were contacts between the phones of Melo, Rafael, and Freitas shows that these men were familiar with one another and communicated semi-regularly. Moreover, our review of the phone records shows that the average number of contacts per month between Melo's phone and those of his alleged coconspirators greatly increased after the commencement of the alleged conspiracy in October of 2015, a fact that would only be apparent to the jury if it had before it phone records that covered a period of time that predated the alleged conspiracy. Given that the records at issue showed at most that there were calls placed between the phones prior to the conspiracy, as the record did not reveal the content of any calls or other communications, it is hard to see how the records were prejudicial to Melo in such a way that merits exclusion under Rule 403.[2]

_____

[2] We also note that Melo's argument necessarily concedes that all of the phone contacts recorded after Melo allegedly joined the conspiracy in October of 2015 were properly admitted. As such, the only records that could be considered potentially prejudicial are those covering March to September of 2015.

In any event, even if we were to assume there was a Rule 403 error, it would still be reviewed for harmlessness. See United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019) (noting that error under Rule 403 only requires a new trial when "it is 'highly probable' that the error did not contribute to the verdict." (quoting United States v. Fulmer, 108 F.3d 1486, 1498 (1st Cir. 1997))).  And, we do not see, nor does Melo explain to us, how the admission of evidence that shows fewer average phone contacts between Melo and Rafael or Freitas in the period that Melo contends predates the start of the alleged conspiracy than occurred during the period that followed its start could, in light of all the evidence, plausibly have been a difference maker in this case.

Melo argues in the alternative that the phone records were evidence of prior bad acts and thus that they were not admissible under Federal Rule of Evidence 404(b).[3]  But, we do not

---

[3] Rule 404(b) states that evidence of "crimes, wrongs, or other acts" are to be treated as follows:

(b) Crimes, Wrongs, or Other Acts.
  (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
  (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

see how these phone records, which Melo himself asserts are "innocuous" and which do not reveal the content of any call, can constitute evidence of prior bad acts.  It is a far cry from the testimony that Melo points us to in United States v. Martínez-Marcado, 919 F.3d 91, 101 (1st Cir. 2019), in which we found that testimony about prior planned, but uncompleted, conspiracies was not admissible under Rule 404(b).  The testimony in that case related to actual planned conspiracies to rob people's homes that the defendant had led, while the evidence here does nothing more than establish that there was contact by phone between alleged coconspirators.  Therefore, we reject Melo's Rule 404(b) challenge as well.

## IV.

Melo's next set of challenges is to the District Court's refusal to issue certain jury instructions that he contends that he requested.  We do not find this set of challenges to have merit.

---

knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
   (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
   (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

First, he argues that the District Court should have given the jury an instruction -- pursuant to Commonwealth v. DiGiambattista, 813 N.E.2d 516 (Mass. 2004) -- that would have allowed it to draw an adverse inference against the government from SAs Pauley and Ryan's failure to record their interview with Melo. Melo made this request prior to the charge conference. The District Court denied the request but did instruct the jury to consider the circumstances surrounding Melo's statements as it weighed the evidence.

Following the charge conference, however, Melo asked the District Court to modify its proposed instruction so that the jury would need to find that he made his statements to the agents voluntarily and that, if the jury found the statements were made involuntarily, the statements must be disregarded. The District Court also denied this request. In doing so, the District Court suggested that the voluntariness of Melo's statements was an issue for it, and not the jury, to decide.

The District Court then charged the jury. At that point, Melo's counsel told the District Court that he was "renew[ing]" his objections to the District Court's refusal to issue his requested instructions.

For preserved jury instruction challenges, "this court reviews de novo 'whether the instructions conveyed the essence of the applicable law' and reviews for abuse of discretion 'whether

- 25 -

the court's choice of language was unfairly prejudicial.'" United States v. Silva, 742 F.3d 1, 10 (1st Cir. 2014) (quoting United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012)). However, the government contends that Melo failed to preserve his challenge to the District Court's failure to issue a DiGiambattista or voluntariness instruction, as the government contends that Melo's objection after the charge was given was not sufficient to meet the demands of Federal Rule of Criminal Procedure 30(d). See United States v. Roberson, 459 F.3d 39, 45 (1st Cir. 2006) ("To preserve an objection to a jury instruction under Fed. R. Crim. P. 30(d), a litigant must lodge a specific objection and state the grounds for the objection after the court has charged the jury and before the jury begins deliberations. Objections registered during pre-charge hearings are insufficient to preserve the issue." (internal citation omitted)).

We need not resolve this dispute over the standard of review here, however. Melo's DiGiambattista challenge runs squarely into our precedent that "there is no federal constitutional right to have one's custodial interrogation recorded," United States v. Meadows, 571 F.3d 131, 147 (1st Cir. 2009), and that declines to require the use of such instructions under our supervisory power, see id.

Melo argues in response that Meadows does not govern here because, unlike in that case, the District Court refused to

- 26 -

instruct the jury to determine whether Melo voluntarily made his statements to the agents. The fact that we previously declined to require the use of DiGiambattista instructions in Meadows had little to do, however, with the fact that the jury in that case was instructed to consider voluntariness. We referenced that separate instruction merely to explain why there was, in any event, little prejudice to the defendant caused by the lack of the requested instruction. See id.

Melo also challenges the District Court's refusal to instruct the jury that it had the power to determine whether Melo's statements were voluntarily made. We have made it clear, however, that the question of whether a defendant voluntarily made a statement to police is for the district court -- and not the jury -- to decide. See United States v. Feliz, 794 F.3d 123, 130 (1st Cir. 2015). So, this challenge also fails.

## V.

We next must address Melo's challenges to the District Court's decisions to limit his ability to argue that he was the only person charged for the events that occurred on November 10, 2015, and to not issue a curative instruction after a witness had mentioned Rafael's and Freitas' convictions. We are not persuaded by these arguments, either.

The following facts are relevant to our assessment of these challenges. Melo requested, via a motion in limine, that

the District Court prohibit the government from introducing any evidence regarding Rafael's and Freitas' convictions arising from the cash-smuggling conspiracy. The District Court denied the motion as moot after the government represented that it did not intend to admit such evidence during trial.

Then, during opening arguments, Melo's counsel told the jury that Melo was the only person being prosecuted for what occurred on November 10, 2015. The government did not immediately object, but it later brought the issue to the attention of the District Court and objected that Melo's statement mischaracterized the nature and outcome of the investigation. In response, the District Court apparently prohibited Melo from making that argument.

On the fourth day of trial, Melo's counsel called his previous supervisor, Bristol County Sheriff Thomas Hodgson, as a witness. Melo's counsel asked Hodgson during his testimony whether Hodgson continued to use Melo as a driver even after learning of the investigation into Melo's alleged role in Rafael's scheme. Hodgson responded, "I don't remember when Carlos Rafael was convicted, Antonio Freitas was convicted."

After Hodgson left the stand, Melo requested that the District Court issue a curative instruction that Rafael's and Freitas' "convictions were not related to this case," to which the government objected. When the District Court said that it was

inclined to do no more than offer an instruction that Melo was the only person on trial, Melo indicated that he was no longer pressing for his more specific curative instruction.

In a motion for reconsideration filed later that day, however, Melo asked the District Court to reverse both its decision to prohibit him from arguing that Melo was the only person being prosecuted for the events on November 10, 2015, and its decision to refuse to give the specific curative instruction that he had requested. The District Court denied the motion, stating both that it would be misleading to allow Melo to argue that he was the only person being prosecuted for the events of November 10, 2015, when all three men were being investigated at the same time, and that the curative instruction Melo requested would unnecessarily attract more attention to the problematic testimony.

**A.**

We consider first Melo's challenge to the District Court's decision to prohibit him from arguing that he was the only one arrested in connection with the events of November 10, 2015. Because Melo made this argument in his motion to reconsider, we review this challenge for abuse of discretion. See United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009).[4]

_____

[4] To the extent Melo's original objection to the District Court's decision to prohibit his argument is preserved, we would still review that decision for abuse of discretion, see United

- 29 -

As best we can tell, Melo's argument is that Rafael's and Freitas' indictments did not encompass the events of November 10, 2015. From that premise, Melo contends that he should have been allowed to argue that he alone was prosecuted over this particular trip to the Azores. But, we agree with the District Court that it would have been misleading to allow such an argument. Allowing Melo to do so would have given the jury the false impression that the government was ignoring other culpable actors in its focus to prosecute Melo. The reality, of course, was that all of the major actors in the conspiracy were investigated and prosecuted. As such, we do not find that the District Court abused its discretion in preventing Melo from making this argument. See United States v. Callipari, 368 F.3d 22, 37 (1st Cir. 2004) (noting that the district court "was well within its discretion" to limit the defendant's ability to make an argument that "would have misdirected the jury"), judgment vacated on other grounds, 543 U.S. 1098 (2005).

**B.**

Melo's challenge to the denial of his curative instruction fares no better. This Court reviews preserved challenges to a district court's refusal to offer a curative instruction for abuse of discretion. See United States v.

States v. Burns, 298 F.3d 523, 543 (6th Cir. 2002), and the outcome would remain the same.

Belanger, 890 F.3d 13, 32 (1st Cir. 2018). However, Melo waived his original request for a curative instruction when he told the District Court that he was no longer pressing that point, given the alternative instruction that the District Court adopted. See United States v. Orsini, 907 F.3d 115, 120 (1st Cir. 2018) ("'A party who identifies an issue, and then explicitly withdraws it, has waived the issue' and cannot resurrect it on appeal." (quoting United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002))). As such, his original challenge is waived.

To the extent Melo appeals the denial of his motion for reconsideration on this point, we review the District Court's denial of that motion for abuse of discretion. See Allen, 573 F.3d at 53. But, in his briefing to us, Melo fails to explain how the reconsideration standard applies to his claim or to argue how he could meet it. See id. (noting that "motions for reconsideration are appropriate only in a limited number of circumstances: if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust"). As a result, his arguments are waived. See United States v. Brown, 621 F.3d 48, 53 n.4 (1st Cir. 2010).

Even if we were to reach the merits of his challenge, moreover, we would reject it. This Court generally recognizes

that trial courts are in the best position to determine if a curative instruction would do more harm than good, and Melo points us to no authority that indicates that, in these circumstances, we should decline to defer to the District Court. See United States v. Rivera-Rodríguez, 761 F.3d 105, 128 (1st Cir. 2014) (finding no abuse of discretion where a district court declined to give a curative instruction after a witness made an improper "stray remark" about the defendant's criminal records).

## VI.

Melo's final pair of related challenges is to the District Court's decision to issue a willful blindness instruction to the jury in relation to Melo's involvement with the cash envelopes and to the District Court's refusal to issue an instruction defining reasonable doubt. Again, we find no merit to the challenges.

The relevant facts are these. At trial, Melo opposed the issuance of any willful blindness instruction. However, he did request that, if the District Court decided to issue the willful blindness instruction, the District Court modify the instruction so as to inform the jury that "mere negligence, mistake, or recklessness in failing to learn the fact is not sufficient" to constitute willful blindness and that it issue an instruction defining the meaning of reasonable doubt.

The District Court agreed to Melo's requested willful blindness instruction modification but refused to instruct the jury as to the meaning of reasonable doubt. After the District Court charged the jury, Melo's counsel stated no more than that he renewed his objections to each of the District Court's instructions on these points.

**A.**

We first consider the challenge to the willful blindness instruction. "A willful blindness instruction is justified if '(1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge.'" United States v. Valbrun, 877 F.3d 440, 445 (1st Cir. 2017) (quoting United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009)).

Melo argues that these factors were not met in his case. But, even if we assume that Melo's challenge to the instruction is preserved, notwithstanding the requirements for preserving it set forth in Federal Rule of Criminal Procedure 30, see United States v. O'Connor, 28 F.3d 218, 220-21 (1st Cir. 1994), it lacks merit.

As to the first element that bears on the propriety of giving the instruction, Melo himself claims that he lacked knowledge of what was in the envelopes Rafael handed to him. Moreover, the facts suggest that the second element was met as

well, as they show that if Melo did not know what was in the envelopes, he took pains not to apprise himself of the envelopes' contents.  Being asked to carry envelopes for another person at the airport, and then being told to pick up the envelopes in a bathroom to avoid detection, reasonably qualify as "red flags." As to the third element, the modified instruction that Melo obtained made it clear to the jury that anything less than knowledge or purpose was not sufficient for finding willful blindness.

## B.

There remains, then, only Melo's challenge to the denial of his reasonable doubt jury instruction request.  Melo asserts that "a case where the government relied so heavily on the concept of willful blindness required an explanation of reasonable doubt to counteract the misleading nature of the charge and the evidence. Due process requires no less."  But, he provides no support for this proposition, and, in fact, our precedent is clearly to the contrary.  See United States v. Jones, 674 F.3d 88, 94 (1st Cir. 2012) (holding that a trial judge "was not required to define reasonable doubt" where the defendant objected that the judge's instructions to the jury were ambiguous).  Thus, this challenge, too, fails.

## VII.

We **affirm** the convictions below in all respects.