# United States Court of Appeals
## For the First Circuit

No. 14-1672

UNITED STATES OF AMERICA,

Appellee,

v.

CAROLE SWAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Darla J. Mondou, with whom Mondou Law Office was on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

November 21, 2016

**HOWARD**, **Chief Judge**.  Defendant-Appellant Carole Swan, former selectperson for the Town of Chelsea, Maine, appeals her convictions for Hobbs Act extortion, 18 U.S.C. § 1951(a), tax fraud, 26 U.S.C. § 7206(1), and making false statements to obtain federal worker's compensation, 18 U.S.C. § 1920. The sole issue raised on appeal is the district court's denial of a motion to suppress incriminating statements made during Swan's interview with two sheriff's deputies.  Swan argues that suppression was required because her statements were obtained through a custodial interrogation without the benefit of a Miranda warning.  See Miranda v. Arizona, 384 U.S. 436 (1966).  Alternatively, she claims that her incriminating statements were not made voluntarily.  See Blackburn v. Alabama, 361 U.S. 199 (1960).  We affirm.

## I.

The citizens of Chelsea, Maine (the "Town"), elected Swan to serve as a selectperson, and she held that position for nineteen years.  During the course of her tenure, however, Swan came under investigation for allegedly using her public office to profit at the Town's expense.  In early 2011, a deputy from the Kennebec County Sheriff's Office ("KCSO") met with Frank Monroe, a local businessman.  Monroe told the deputy that Swan had instructed him to over-bill the Town for sand delivery and pay her a $10,000 kickback.

After receiving this information, the KCSO set up a sting operation. Under the direction of the sheriff's office, Monroe submitted an inflated bill to the Town for the amount indicated by Swan. The invoice was subsequently approved and a check to Monroe was issued. On February 3, 2011, Swan collected the check from the Town and instructed Monroe to pick it up from the mailbox located at the end of her driveway. Monroe picked up the check, while being watched by two KCSO deputies, Lieutenant Ryan Reardon and Detective David Bucknam. Reardon and Bucknam then gave Monroe a bag of money, with directions to deliver it to Swan. Monroe met Swan and gave her the kickback. After accepting the funds, Swan drove to the parking lot of a nearby laundromat. The deputies followed Swan and parked behind her.

As Swan made her way towards the laundromat, the deputies stepped out of their vehicle and approached her. Reardon, displaying his badge, called out "Carole," and told her, "I want my money back." Swan responded that Monroe owed her money. Reardon reiterated that he wanted the money back. Swan returned to her vehicle, retrieved the bag of money, and handed it to Reardon. She asked whether she was in trouble. The deputies suggested that they discuss the issue at the sheriff's office, rather than in the parking lot. Swan assented and — accompanied by Bucknam — drove herself to the station. At some point during

the encounter in the parking lot, Bucknam came into possession of Swan's phone.

At the sheriff's office, Swan met with Reardon and Bucknam in an interview room. The deputies assured Swan that she was "not under arrest," that she was free to leave "[a]t any point," and that it was "fine" if she did not "want to have [a] conversation" with them. Despite these assurances, Swan stayed and spoke with the deputies. The deputies initially maintained possession of Swan's cellphone. When Swan asked whether she could have the phone back, Bucknam told her that he would return it soon, explaining that he was only keeping the phone so that Swan would not get distracted. Shortly thereafter, Swan's phone rang and she reached for it, saying that it was her husband. Bucknam told Swan that he was "just gonna to hit the thing" and send the call "to voicemail." Swan responded, "All right."

Over the course of her hour-and-a-half conversation with deputies, Swan made numerous incriminating statements, including an admission that she had received approximately $25,000 in kickbacks. Towards the end of the interview, Swan told the deputies that she needed to call her husband. The officers returned her phone, offered to let her step outside to make the call, and, ultimately — when Swan opted to stay put — left the room. After speaking with her husband, Swan told the officers that they could come back in and resume the conversation. She

retained her phone for the rest of the interview and, when it ended, thanked the officers.

A federal grand jury subsequently indicted Swan on multiple counts of Hobbs Act extortion, as well as tax fraud and making false statements to obtain federal worker's compensation. The district court severed the charges, allowing Swan to receive two separate jury trials: one for extortion and a second for the remaining counts.

Before trial, Swan moved to suppress the statements that she had made at the sheriff's office. Following an evidentiary hearing, a magistrate judge recommended denying Swan's motion, concluding that she had not been subjected to a custodial interrogation and that her confession was voluntary. The district court agreed and denied the motion to suppress.

Ultimately, Swan was convicted of three counts of Hobbs Act extortion, five counts of tax fraud, and two counts of making false statements to obtain federal worker's compensation. This timely appeal followed.

## II.

When considering the denial of a motion to suppress, "we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Almeida, 434 F.3d 25, 27 (1st Cir. 2006). Factual findings "are clearly erroneous only when . . . the reviewing court . . . is left with

the definite and firm conviction that a mistake has been committed." United States v. McLaughlin, 957 F.2d 12, 17 (1st Cir. 1992) (citation omitted). Additionally, we "may affirm . . . suppression rulings on any basis apparent in the record." United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).

## A.

The police are required to provide a Miranda warning before subjecting a suspect to custodial interrogation. United States v. Davis, 773 F.3d 334, 338 (1st Cir. 2014). Accordingly, the need for a Miranda warning "turns on whether a suspect is in custody." United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011). In this context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012). The relevant inquiry is "whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. (citations omitted) (alteration in original). We have previously identified a number of factors relevant to this determination, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and

character of the interrogation." <u>United States</u> v. <u>Masse</u>, 816 F.2d 805, 809 (1st Cir. 1987) (citation omitted).

Here, Swan contends that she was in custody during her initial encounter with Reardon and Bucknam in the parking lot because, among other things, the deputies effectively trapped her in a relatively tight space, insisted on speaking with her at the sheriff's office, and accompanied her on the drive to that location. The magistrate judge's factual findings, however, undermine Swan's argument. The magistrate determined that the deputies merely suggested that Swan speak with them at the sheriff's office. It similarly found that Swan was not ordered to ride with Bucknam. Rather, this too was merely a suggestion to which Swan agreed. Swan's voluntary decision to meet at the stationhouse strongly suggests that she was not "in custody" for the purposes of <u>Miranda</u>. <u>See</u> <u>McCown</u> v. <u>Callahan</u>, 726 F.2d 1, 6 (1st Cir. 1984) (Breyer, J.) (finding interaction with law enforcement non-custodial because the "defendants had come to the station voluntarily," "were told that they were not under arrest," and "left the station undisturbed").

In any event, although we doubt that the district court's factual findings were clearly erroneous, it is unnecessary for us to decide whether the encounter in the parking lot was custodial. This is because, in conducting the <u>Miranda</u> analysis, we focus on the time that the relevant statements were made. For example, in

- 7 -

United States v. McCarty, 475 F.3d 39 (1st Cir. 2007), we considered whether to suppress unwarned statements by a defendant who had been handcuffed only minutes beforehand. Although we observed that the defendant undoubtedly had been "in custody" while restrained, we held that the situation became non-custodial by the time that the questioning began. Id. at 45-46. This was because the officers had taken off the defendant's handcuffs and "explained . . . that he was not under arrest, that he was free to leave at any time, and that he did not have to answer any questions." Id. at 46. Accordingly, there was no need to administer a Miranda warning.[1]

So too here. Even assuming that the confrontation in the parking lot was custodial, Swan was not entitled to a Miranda warning unless she remained in custody at the stationhouse when she made the statements now at issue. Based on the totality of the circumstances, we conclude that the interview at the stationhouse was non-custodial.

---

[1] Other circuits have applied a similar analysis. See United States v. Gordon, 294 F. App'x 579, 584 (11th Cir. 2008) (per curiam) (unpublished) (holding that the defendant's telephone conversation with an agent after his arrest and release was not subject to Miranda requirements because the defendant "was not in custody at the time he made the statements at issue"); United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) (explaining that interrogation was non-custodial despite the fact that law enforcement "corralled the [defendant] at the onset of the search" because the "main focus must be on the individual's restraint during the interview" (emphasis in original)).

We begin by emphasizing that, as in McCarty, the deputies prefaced their questioning by telling Swan that she was "not under arrest," that she was free to leave "[a]t any point," and that it was "fine" if she did not "want to have [a] conversation" with them. These unambiguous statements would have led a reasonable person in Swan's position to understand that she was not "in custody," notwithstanding what had transpired in the parking lot. See McCarty, 475 F.3d at 45-46; United States v. Infante, 701 F.3d 386, 398 (1st Cir. 2012) (holding that the defendant was not in custody where the interviewing officer "informed [him] during each interview that he was not under arrest or in custody and that he did not have to speak with the officers"); United States v. Ellison, 632 F.3d 727, 728 (1st Cir. 2010) (Souter, J.) (concluding that questioning did not constitute custodial interrogation where an officer informed the suspect that "he was not under arrest . . . , did not have to answer any questions, and was free to end the interview at any time").

Other evidence that the questioning was a custodial interrogation is also lacking. Turning to the relevant factors, we first consider the location of the interview. Swan met with the deputies at the sheriff's office behind closed doors. However, the deputies made it clear to Swan that she was free to leave and that the door was closed only for the sake of privacy. Without more, the mere fact that the questioning took place at the station

does not render it custodial. See, e.g., United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987) ("Even when questioning occurs in the stationhouse, a suspect need not be given Miranda warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in 'custody.'").

Next, "[t]he number of officers present . . . was not overwhelming, lending support to a finding that the questioning was non-custodial." Infante, 701 F.3d at 397. Reardon and Bucknam were the only law enforcement officers involved in the interview. We have previously declined to find that a defendant was in custody even when confronted by as many as five police officers. See Quinn, 815 F.2d at 157; see also Infante, 701 F.3d at 397-98 (holding that presence of two officers, joined briefly by two others, was not overwhelming). We also note that the deputies never drew their weapons at any point during their interactions with Swan. See Hughes, 640 F.3d at 436 (finding interrogation non-custodial when officers "carried visible weapons" which "remained in their holsters throughout the visit").

Similarly, Swan was not handcuffed or otherwise physically restrained at the sheriff's office. See id. ("[W]e think it significant that no meaningful physical restraint was applied to the defendant . . . . For aught that appears, no officer made physical contact with him." (citations omitted)). This too suggests that the interaction was non-custodial.

Finally, the duration and character of the interview reinforce the conclusion that Swan was not in custody. Swan spent approximately ninety minutes at the sheriff's office. We have held that encounters of similar length are not necessarily custodial. See, e.g., id. at 437 ("The relatively short duration of the interview, which lasted roughly ninety minutes . . . [is] also consistent with the finding that the interview was not custodial."). Additionally, as the magistrate judge noted, the conversation was characterized by "a generally even-tone back and forth." See, e.g., United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) (holding that interview was non-custodial where the officer "used a normal tone of voice" during questioning).

Swan, however, points out that the officers were in possession of her cellphone throughout much of the interview and claims that this fact renders the interaction custodial. But we do not find this fact to be determinative. Bucknam explained to Swan that the deputies would return her phone, but were holding it during the interview because they did not want her to get distracted. It is true that the deputies sent a call from Swan's husband to voicemail, but they did so only with her permission. And when Swan later told the deputies that she needed to call her husband, they not only allowed her to make the call but also left the room. In light of the facts considered as a whole, the officers' temporary possession of Swan's cellphone was not

sufficient to trigger Miranda.  Nor does the precedent suggest otherwise.  See United States v. Campbell, 741 F.3d 251, 267 (1st Cir. 2013) (finding questioning to be non-custodial despite the fact that "the defendants may have temporarily been unable to use their cellular phones"); United States v. Salinas, 543 F. App'x 458, 464-65 (5th Cir. 2013) (unpublished) (referring to retention of suspect's phones as "some evidence that the encounter was custodial" but ultimately affirming finding that the defendant was not in custody).

In sum, after considering the relevant factors, we conclude that a reasonable person in Swan's position would have felt able to terminate the interview and leave the station. Accordingly, Swan was not subjected to a custodial interrogation, and it was unnecessary to provide her with Miranda warnings.[2]

**B.**

Swan's remaining claim that her confession was involuntary lacks merit.  The previously discussed facts establish

---

[2] Swan suggests, for the first time on appeal, that the deputies "seized" the bag of money and cellphone within the meaning of the Fourth Amendment.  She argues that such a seizure could only be justified as a "search incident to arrest."  Accordingly, she must have been arrested and, thus, in custody for purposes of Miranda.  This contention is without merit.  Undoubtedly, some seizures are conducted incident to an arrest.  But there are also a number of other situations in which warrantless seizures are permissible.  Thus, even if a seizure had taken place (and we expressly decline to reach this issue), it would not necessarily follow that Swan was in custody.

- 12 -

that the government's conduct did not overbear Swan's will. In short, "[t]he tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials," all of which indicates "a lack of coercion . . . [and] support[s] the district court's finding of voluntariness." Hughes, 640 F.3d at 438.

Swan primarily argues that her statements were involuntary because the deputies promised her leniency in exchange for her cooperation. This contention need not detain us long, as "[i]t is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment." United States v. Jacques, 744 F.3d 804, 809-10 (1st Cir. 2014).

**III**.

For the foregoing reasons, we **AFFIRM** Swan's convictions.