# United States Court of Appeals
## For the First Circuit

No. 20-1184

UNITED STATES,

Appellee,

v.

LARRY O'NEAL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, <u>U.S. District Judge</u>]

Before

Kayatta and Barron, <u>Circuit Judges</u>,
and O'Toole,* <u>District Judge</u>.

<u>Hunter J. Tzovarras</u> and <u>Pelletier Faircloth & Braccio LLC</u> on brief for appellant.
<u>Julia M. Lipez</u>, Assistant United States Attorney, <u>Donald E. Clark</u>, United States Attorney, and <u>Chris Ruge</u>, Assistant United States Attorney, on brief for appellee.

November 4, 2021

---

* Of the District of Massachusetts, sitting by designation.

**KAYATTA, Circuit Judge**.  Larry O'Neal was employed by U.S. Customs and Border Protection (CBP) when he came under investigation for downloading child pornography on his home computer.  Following his indictment and a trial, a jury convicted O'Neal of one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

O'Neal now raises two issues on appeal, each concerning pretrial conduct by the investigating agents.  First, he argues that the district court erred in refusing to suppress incriminating statements O'Neal made when interviewed at his workplace by federal agents.  O'Neal contends that the interview was custodial; the district court held that it was not.  Second, O'Neal argues that the district court erred in denying a post-trial motion aimed at obtaining a Franks hearing to review an error in an affidavit that was used to secure the search warrant that led to the discovery of incriminating evidence on O'Neal's home computer.  For the following reasons, we find O'Neal's arguments unconvincing.

## I.

We consider first whether the district court committed reversible error in finding that O'Neal's interview was not custodial.  In so doing, we accept the district court's findings of fact and its credibility determinations unless clearly erroneous.  See United States v. Rodríguez-Pacheco, 948 F.3d 1, 6 (1st Cir. 2020).  We review de novo any conclusions of law,

- 2 -

including the ultimate determination of whether the defendant was in custody for <u>Miranda</u> purposes.  <u>United States</u> v. <u>Campbell</u>, 741 F.3d 251, 265 (1st Cir. 2013).

**A.**

In January 2018, federal agents with Homeland Security Investigations (HSI), an investigative branch of the U.S. Department of Homeland Security (DHS), determined that two files containing child pornography had been downloaded by a device with an IP address assigned to O'Neal.  At the time, he was employed as an officer with CBP (also part of DHS) at the Houlton, Maine Port of Entry.  <u>United States</u> v. <u>O'Neal</u>, 1:18-cr-00020-JDL, 2018 WL 5023336, at *1 (D. Me. Oct. 16, 2018).  In the course of HSI's investigation, Special Agent Edward Ainsworth used resources from a law enforcement database that monitors an online peer-to-peer file-sharing network as well as the HSI Cyber Crimes Center, which maintains a library of suspected child pornography files.  <u>United States</u> v. <u>O'Neal</u>, 1:18-cr-00020-JDL, 2019 WL 3432731, at *1 (D. Me. July 30, 2019).  Through the Cyber Crimes Center, Ainsworth was able to view a copy of one of the two files associated with O'Neal's IP address.  <u>Id.</u>  Ainsworth determined that that video "depicted a prepubescent female having sexual intercourse with an adult male."  <u>Id.</u>[1]

---

[1] The file was referred to throughout the proceedings below

Ainsworth prepared an affidavit in support of a search warrant for O'Neal's home, vehicles, and person, which relied in part on the video of the prepubescent girl.  Id.  On January 17, 2018, that search warrant was issued.  The search of O'Neal's home took place on January 19, 2018, while O'Neal was at work.  It resulted in the seizure of O'Neal's computers and hard drives. Id.

HSI agents arranged with O'Neal's supervisor, Assistant Port Director Joseph Ewings, to interview O'Neal at his workplace that morning while the search was conducted.  O'Neal, 2018 WL 5023336, at *1.  After his arrival at work that day, O'Neal checked his firearms and duty gear into a lock box.  Shortly thereafter, Director Ewings asked him to help move a printer.  When O'Neal followed Director Ewings toward the ostensible location of the printer, he arrived at a common area that served as a break and copy room, where he was greeted by Agent Ainsworth.  Id.  Ainsworth introduced himself and asked O'Neal to enter a room not occupied at the time by CBP personnel.  O'Neal agreed.  He and Ainsworth entered the room, where Agents Jonathan Posthumus and James Perro were waiting.[2]  O'Neal spent approximately the next two-and-a-half

_____

as the "12yo video" because of its filename.  O'Neal, 2019 WL 3432731, at *1 n.1.

[2] Special Agent James Harvey, the Resident Agent-in-Charge of the Houlton HSI office, was also present in the common area when O'Neal first arrived, as was someone from CBP's Office of

hours inside the room with the three agents, with the door pulled shut but not locked. Two other individuals affiliated with the government waited outside the room. The room was approximately 12 or 14 feet by 15 or 16 feet in size. O'Neal sat in a chair facing a desk. Although he would have had to walk past at least one agent to exit, nothing obstructed his path to the door. Id. at *1-2. The agents were dressed in plain clothes and no weapons were visible, although Ainsworth carried a holstered firearm. Id. at *2.

Two of the agents present at the interview -- Posthumus and Ainsworth -- later testified at the district court's hearing on O'Neal's motion to suppress. Posthumus testified that he told O'Neal at least twice that "he wasn't under arrest, he was free to leave at any time." Ainsworth also testified that Posthumus told O'Neal, "[Y]ou are not under arrest, you're free to go." The district court credited this testimony in concluding that "the agents told O'Neal [before the interview] that he was free to leave." Id. at *3.

One of the agents also read O'Neal his "Beckwith rights."[3] O'Neal signed a form waiving those rights. He was not

Professional Responsibility with the last name Millar. Neither Harvey nor Millar interacted with O'Neal or attended his interview.

[3] Beckwith v. United States, 425 U.S. 341 (1976), did not mandate any warnings, but instead held that the defendant in that case was not entitled to Miranda warnings. Id. at 347—48. The

apprised during the interview of his right to counsel under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).  At no point did O'Neal ask to leave or to stop the questioning.  <u>O'Neal</u>, 2018 WL 5023336, at *2.

The agents discussed a variety of topics with O'Neal, including hunting, motorcycles, potato farming, and church.  The agents also told O'Neal he was being investigated for possession of child pornography and that a search warrant was being executed at his home.  During the course of the interview, O'Neal admitted to knowingly searching for and downloading child pornography.  At some point, O'Neal was asked whether he had had any sexual contact with children; he responded that he had not.  <u>Id.</u>  At the conclusion of the interview, the agents asked whether O'Neal would be willing

---

Federal Service Impasses Panel then adopted a proposal to advise employees of their so-called "<u>Beckwith</u> rights" when employees undergo non-custodial interviews involving criminal matters.  <u>In re Dep't of the Treasury Bureau of Engraving & Printing & Ch. 201, Nat'l Treasury Emps. Union</u>, Case No. 99 FSIP 96 (1999), https://www.flra.gov/fsip/finalact/99fs_096.html (last visited Oct. 15, 2021).  As the district court explained:

> [<u>Beckwith</u>] rights are provided to people in the course of internal affairs investigations before interviews are conducted.  The <u>Beckwith</u> warnings advise that the interviewee has the right to remain silent, that anything the person says may be used as evidence in a later administrative or criminal proceeding, and that the person's silence may be given evidentiary value in a later administrative proceeding.

<u>O'Neal</u>, 2018 WL 5023336, at *2.

- 6 -

to take a polygraph to verify that fact, and he agreed.  Before he took the polygraph, O'Neal took a break and left to use the restroom.  Id.  No one accompanied him to or from the restroom, which was located outside the area of the office in which the interview was conducted.  Id. at *3.[4]  He returned to the then-empty larger office to wait while the polygraph machine was set up in a nearby smaller office.  Before O'Neal took the polygraph, he was read his Miranda rights, which he waived.  After he completed the polygraph test, the agents arrested O'Neal.  Id. at *2.

**B.**

Miranda warnings must be given before a custodial interrogation.  United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016).  There is no dispute here that the agents subjected O'Neal to an interrogation during the interview.  See United States v. Melo, 954 F.3d 334, 339 (1st Cir. 2020) ("Interrogation for Miranda purposes includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (alteration in original) (quoting United States v. Sanchez, 817 F.3d 38, 44

---

[4] In light of the clear error standard of review, we defer to the district court's view of the facts.  We note, however, that the hearing record is somewhat ambiguous as to whether one of the agents joined O'Neal in using the restroom.  However, no party has disputed the district court's finding that O'Neal was "unaccompanied."

- 7 -

(1st Cir. 2016))). Consequently, the pivotal question is whether O'Neal was in custody. See id.; Swan, 842 F.3d at 31.

We answer that question by first ascertaining "whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" Melo, 954 F.3d at 339 (alteration in original) (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)). Factors that can shed light on whether an individual was in custody include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. at 340 (quoting Swan, 842 F.3d at 31).

The interview commenced with the officers' explanation for their visit and their inviting O'Neal to speak with them in private. As Agent Posthumus explained at the suppression hearing:

> I said that he's not under arrest, he's free to leave at any time. However, there were some things that had come up in an investigation. I'd like to explain some things to him so he could be made aware of why we wanted to speak with him and that hopefully he could clarify some things for us and asked him if he would be willing to speak in the office as some of the matters were sensitive and somewhat private in nature.

Consistent with the explanation that privacy was called for, the door to the conference room was closed but not locked.

The agents did not exercise physical control over O'Neal or restrain him. He made a trip to the bathroom, unaccompanied, between the interview and the polygraph examination. O'Neal, 2018 WL 5023336, at *3 (distinguishing United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007), in which this court concluded that a defendant was in custody in his home when agents exercised physical control over him by escorting him everywhere, including to the bathroom).

The number of officers present -- three in the room itself, with an additional two outside -- was undoubtedly concerning, but not so overwhelming as to establish custody by itself. See Melo, 954 F.3d at 340 (finding suspect was not in custody although two armed officers were present for questioning with two additional law enforcement personnel on scene); Swan, 842 F.3d at 32—33 ("We have previously declined to find that a defendant was in custody even when confronted by as many as five police officers." (citation omitted)); United States v. Infante, 701 F.3d 386, 397 (1st Cir. 2012) (finding no custody where "two officers were in the room, joined briefly by two others"). The agents carried concealed weapons, but they were never drawn. See Swan, 842 F.3d at 33 ("We also note that the deputies never drew their weapons at any point during their interactions with [the defendant]."); United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (finding interrogation non-custodial when officers

"carried visible weapons" which "remained in their holsters throughout the visit").

We have previously described a ninety-minute interview as "relatively short." Hughes, 640 F.3d at 437 (citing Beckwith, 425 U.S. at 342-43, 347-48). This one was admittedly longer -- about two-and-a-half hours altogether -- although the tone of the conversation was "relatively calm and nonthreatening." O'Neal, 2018 WL 5023336, at *3 (quoting United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011)).

The foregoing description of the circumstances of the interview leads us to agree with the district court's conclusion that the interrogation was not custodial. We reach that result most confidently because of the two express statements agents made to O'Neal, telling him that he was indeed free to leave. See Swan, 842 F.3d at 32 ("These unambiguous statements would have led a reasonable person in [the defendant's] position to understand that she was not 'in custody.'").

This is not to say that such warnings necessarily preclude finding that an interview is custodial. For example, in United States v. Rogers, this court held that the defendant was in custody despite an officer saying, "we're not forcing you to be right here . . . that door's unlocked [and] [n]obody's going to jump out and try to stop ya . . . ." 659 F.3d 74, 76, 79 (1st Cir. 2011) (Souter, J.) (alterations in original).

In Rogers, however, the otherwise plainly noncustodial effect of the "free to leave" statement was undercut by the fact that the defendant was a noncommissioned military officer, ordered by his commanding officer to meet with the law enforcement officers who interviewed him. Id. at 76, 78. We cited "the influence of military authority" in finding that the commander effectively ordered the defendant, a subordinate, into the custody of the police. See id. at 77-78.

Here, no such military influence is involved. And while we do not doubt that a direct order from the Assistant Port Director would carry perhaps more weight than a direct order from a supervisor in some other jobs, no one would confuse O'Neal's relationship with his boss with that of a subordinate and his commanding officer in the military. Moreover, O'Neal's direct supervisor never gave such an order, instead resorting to pretext to lead O'Neal to the agents.

O'Neal also relies on United States v. Slaight, 620 F.3d 816, 819 (7th Cir. 2010), where the Seventh Circuit determined that an individual was in custody although "[t]he police repeatedly told [the defendant] that he was free to leave." But in that case, after first telling the defendant that he was free to leave, the law enforcement officer did not object when the defendant replied that "he had no choice but to remain because they were going to arrest him anyway." Id. Additionally, in Slaight, "nine (possibly

ten)" federal and local officers arrived at the defendant's home before the interrogation. Id. at 818. They entered the house with "drawn guns, including assault rifles," and found Slaight naked in his bed. Id. at 818, 820. Two of the officers escorted Slaight from the home, where they told him they would prefer to interview him at the police station. Slaight accompanied them to the station, where he was interviewed in "the smallest interrogation room [the trial judge had] ever seen." Id. at 819. Toward the end of the interview, Slaight asked to leave the room to smoke a cigarette, id. at 820; in contrast to O'Neal's use of the restroom, Slaight's request was denied. Moreover, when the officers later left the room for forty minutes, they locked him in. Id. The court found that "[a]nyone in [Slaight's] situation would have thought himself in custody." Id.

In his reply brief, O'Neal for the first time "suggests it was clear error by the lower court to credit the two agents['] testimony that they told Mr. O'Neal he was not under arrest and free to leave at the start of the interrogation." "[A]rguments raised for the first time in an appellate reply brief ordinarily are deemed waived." United States v. Casey, 825 F.3d 1, 12 (1st Cir. 2016). Even were we to assume that O'Neal has not waived his challenge to the district court's finding that the agents told him he was free to leave, that challenge would fail. O'Neal argues that the agents were not believable because they did not document

their statements that O'Neal could leave. But the report from the two-and-a-half hour interview was only approximately two pages long. One could readily imagine that the agents would focus on memorializing what O'Neal said, rather than what they routinely state in such interviews. More importantly, we find no reason to believe that the district court's decision, which weighed the agents' testimony on this point, was clearly erroneous.

In sum, while the warnings alone may well have been insufficient to preclude a finding of custody, here they decisively tip the scales in favor of a conclusion that a reasonable person in O'Neal's spot would have believed that departure was an option. The agents were therefore not obligated to read O'Neal his Miranda rights before he made the incriminating statements at issue in this appeal.

## II.

We next consider the district court's denial of O'Neal's request to file a post-trial motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). This argument arises from the procurement of the warrant used to search O'Neal's premises. In reviewing a district court's decision to deny a Franks hearing, this court reviews factual determinations for clear error and its legal conclusions -- such as the probable cause determination -- de novo. United States v. Barbosa, 896 F.3d 60, 67 (1st Cir. 2018).

**A.**

In preparing the affidavit used to obtain the warrant authorizing the search of O'Neal's home, vehicle, and person, Ainsworth made a mistake: He stated in the affidavit that the video of the prepubescent girl was last associated with O'Neal's IP address on December 28, 2017 (the date a different video not viewed by Ainsworth was downloaded), rather than on October 3, 2017 (when the prepubescent-girl video was actually downloaded). O'Neal, 2019 WL 3432731, at *1-2. When this error was noted, the government provided O'Neal's counsel with a corrected affidavit. The government also used the October 3 date in its pretrial submissions. O'Neal's counsel later stated that he did not notice the change until the first day of trial, when the lead government witness testified that the video of the prepubescent girl was associated with O'Neal's IP address on October 3, 2017. Having belatedly noticed the change, defense counsel opted to do nothing about it during the ensuing four days of trial. Instead, after the jury returned a guilty verdict, counsel filed a motion citing the error in the original warrant application as reason to conduct a Franks hearing. Id. at *1.

In that motion, O'Neal contended that the search warrant application "contained false and misleading information." Id. at *2. He reasoned that a viewing on October 3rd, rather than December 28th, gave less cause to think that the video would still

be on the computer on January 18th, the day the affidavit for the search warrant was drawn up.  The district court found O'Neal's motion untimely, as "[a] request for the suppression of evidence 'must be raised by pretrial motion'" unless "the party shows good cause."    Id. at *2  (quoting  Fed.  R.  Crim.  P. 12(b)(3)(C), 12(c)(3)).   The district court further held that "even if the request is treated as timely, O'Neal has failed to make the required preliminary showing that would entitle him to a Franks hearing."  Id.  O'Neal, in the district court's estimation, failed to show that any false statement or omission was made "knowingly and intentionally or with reckless disregard for the truth."  Id. at *3 (quoting United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015)).   The District Court also found that the affidavit, when reformed to correct the error, was sufficient to support a finding of probable cause.

**B.**

When, as here, incorrect information is contained in an affidavit that is used to obtain a warrant, the trial court may hold a so-called Franks hearing to determine whether evidence obtained with the warrant should be excluded at trial.  438 U.S at 156.  However, "[a] defendant is entitled to a Franks hearing . . . only if he first makes a 'substantial preliminary showing' of the same two requirements that he must meet at the hearing."  United States v. Arias, 848 F.3d 504, 511 (1st Cir. 2017) (quoting

- 15 -

McLellan, 792 F.3d at 208). First, he must show that "a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth," and second, he must establish "that the false statement or omission was 'necessary to the finding of probable cause.'" Id. (quoting McLellan, 792 F.3d at 208).

An application for a Franks hearing ordinarily is required to meet timeliness standards: A request for the suppression of evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). "[I]f the party shows good cause," a court may consider an untimely request. Fed. R. Crim. P. 12(c)(3).

The premise of O'Neal's argument -- that Ainsworth intentionally included materially false information in the affidavit -- is dubious. We see no reason to view the several-month difference in dates as material. Nor does the mistake appear to have been intentional. See United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015) (errors that are clearly only negligent do not call for a Franks hearing). In any event, we agree with the district court that O'Neal's motion was untimely. All of the relevant information was available to O'Neal before his trial began. Counsel admits noticing the error on the first day of trial, but chose to wait to see what the verdict would be before

- 16 -

raising the issue.  O'Neal has therefore not provided any "good cause" for the delayed filing of his request.

## III.

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.